1
EAGAN AVENATTI, LLP
Michael J. Avenatti, State Bar No. 206929
2
mavenatti@eaganavenatti.com
Ahmed Ibrahim, State Bar No. 238739
3
aibrahim@eaganavenatti.com
Andrew Stolper, State Bar No. 205462
4
astolper@eaganavenatti.com
520 Newport Center Drive, Suite 1400
5
Newport Beach, CA 92660
Telephone: 949.706.7000
6
Facsimile: 949.706.7050

7
Attorneys for Plaintiff, Individually and On
Behalf of All Others Similarly Situated
8

9

10
UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA
11

12

13
HRAYR SHAHINIAN, M.D., F.A.C.S., an individual, on behalf of himself and all others similarly situated; PRIME
14
HEALTHCARE CENTINELA, LLC, a Delaware limited liability company, on
15
behalf of itself and all others similarly situated; PRIME HEALTHCARE
16
SERVICES – GARDEN GROVE, LLC, a Delaware limited liability
17
company, on behalf of itself and all others similarly situated; BAHAMAS
18
SURGERY CENTER, LLC dba Bahamas Surgery Center, a California
19
limited liability company, on behalf of itself and all others similarly situated;
20
PRIME HEALTHCARE SERVICES – HARLINGEN, LLC, a Delaware
21
limited liability company, on behalf of itself and all others similarly situated;
22
KNAPP MEDICAL CENTER, LLC, a Texas limited liability company, on
23
behalf of itself and all others similarly situated; and PRIME HEALTHCARE
24
SERVICES – LANDMARK, LLC, a Delaware limited liability company, on
25
behalf of itself and all others similarly situated;
26

27
Plaintiffs,

vs.
28

CASE NO.:  14-CV-08390-DMG(PLAx)


SECOND AMENDED NATIONWIDE AND CALIFORNIA, TEXAS, AND RHODE ISLAND CLASS ACTION COMPLAINT FOR:

1.   FRAUDULENT CONCEALMENT/NON-DISCLOSURE;
2.   FRAUD (AFFIRMATIVE MISREPRESENTATIONS);
3.   UNFAIR BUSINESS PRACTICES (Cal. Bus. & Prof. Code § 17200 *et seq.*)

DEMAND FOR JURY TRIAL

1   KIMBERLY-CLARK
    CORPORATION, a Delaware
2   Corporation; and HALYARD
    HEALTH, INC., a Delaware
3   Corporation,

4                    Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Hrayr Shahinian, M.D., F.A.C.S., Prime Healthcare Centinela, LLC, Prime Healthcare Services – Garden Grove, LLC, Bahamas Surgery Center, LLC, Prime Healthcare Services – Harlingen, LLC, Knapp Medical Center, LLC, and Prime Healthcare Services – Landmark, LLC (collectively, "Plaintiffs"), on behalf of themselves and various classes of all others similarly situated, hereby allege as follows:

## I.   BACKGROUND

1.     This action is brought against defendants Kimberly-Clark Corporation ("Kimberly-Clark") and Halyard Health, Inc. ("Halyard") (collectively, "Defendants") for marketing and selling medical gowns represented to provide the highest level of liquid barrier protection (AAMI Level 4) from the transfer of bodily fluids, bacteria, and infection between a patient and healthcare professional. Contrary to their representations, Defendants have known since at least as early as 2012 that their purported High Performance Gowns failed industry standard tests conducted in accordance with American Society for Testing and Material ("ASTM") protocol, they do not meet the relevant standards for gowns represented to be AAMI Level 4 and are unsafe as a result.  Specifically, during ASTM F1671 tests of numerous random samples taken from multiple separate manufacturing lots of the gowns, Defendants' High Performance Gowns failed to meet the standards set by AAMI Level 4, with many of the failures so great that they can only be described as catastrophic.  Among other things, the tests revealed that the gowns allowed liquid and bacterial and viral pathogens to penetrate the gowns.  And yet from at least as early as 2012 to the present, Defendants have continued to fraudulently sell these gowns as AAMI Level 4 and misrepresent to Plaintiffs and other of its customers and the general public that these gowns are impermeable and are effective when treating patients with serious diseases such as Ebola; despite all the while knowing and failing to disclose that they are unsafe for AAMI Level 4 medical procedures and pose great risk of bodily harm and possibly death to patients and healthcare professionals worldwide.  Defendants' recklessness and

indifference as to the fact that they are responsible for placing patients and healthcare professionals at great and unnecessary risk of infection and bodily harm is nothing short of astonishing and utterly reprehensible.

## II.    PARTIES

2.    Plaintiff Hrayr Shahinian, M.D., F.A.C.S. ("Dr. Shahinian") is a citizen of the State of California, and resident of Los Angeles County.  Plaintiff Shahinian is a medical doctor and experienced surgeon who practices and resides in the County of Los Angeles, State of California, within the Central District.

3.    Dr. Shahinian is a skull base surgeon and founder of the Skull Base Institute (SBI).  Since 1994, he has pioneered numerous new endoscopic surgical techniques to treat a variety of skull base disorders and is nationally and internationally recognized as one of the first surgeons in the world to use and pioneer endoscopic skull base surgery.  He is Board Certified by the American Board of Surgery and has been licensed to practice in California since 1996.  He completed his undergraduate studies at the American University of Beirut in 1981 and earned his M.D. in 1985.  He earned both degrees with distinction and has been an active member of the honor medical society, Alpha Omega Alpha.  In 1986, Dr. Shahinian was recruited to Vanderbilt University Medical Center, where he completed an internship and residency in general surgery.  In 1991, Dr. Shahinian went to New York University's Institute of Reconstructive Plastic Surgery, the premier craniofacial program in the nation where he completed a two-year fellowship in plastic and reconstructive surgery.  Thereafter, in 1993, he completed a fellowship in skull base surgery and neurotology in the Department of Head and Neck Surgery in Zurich, Switzerland under the tutelage of Professor Ugo Fisch, the preeminent skull base surgeon in the world at the time.  In 1994, Dr. Shahinian completed a second fellowship, in craniofacial surgery, at New York University.  He was certified by the American Board of Surgery in 1992, recertified in 2003 and 2014, and is a Fellow of the American College of Surgeons

since 2002.  From 1994-1996, Dr. Shahinian served as an Assistant Professor of Surgery and Neurosurgery at the State University of New York at Stonybrook, during which time he was also Co-Director (1994-1995), and then Director (1995-1996) of the University's Skull Base Institute.  In 1996, Dr. Shahinian was recruited by Cedars-Sinai Medical Center to establish and head its Division of Skull Base Surgery and to direct its Skull Base Institute.  Dr. Shahinian accepted the offer, relocated to California and was instrumental in establishing what has become one of the country's largest practices specializing in minimally-invasive endoscopic skull base and brain tumor surgery:  The Skull Base Institute (SBI) in Los Angeles.  Neurosurgeons from the United States as well as Barcelona, Marseilles, Brussels, Cairo, Kiev, Rome and Czech Republic have travelled to Dr. Shahinian for observation and training in Skull Base Surgery.  Patients from around the world and most of the 50 states also routinely travel to Los Angeles to be treated by Dr. Shahinian.  Dr. Shahinian has received many awards for his work in skull base surgery and has shared his experience and expertise in numerous journal articles, textbook chapters, and national and international presentations.  He is also the author of the textbook, "Endoscopic Skull Base Surgery," which was published by Humana Press in 2009.  Dr. Shahinian holds a number of patents and has thrice received the National Aeronautics and Space Administration (NASA) Innovation Award (in 2008, 2011 and 2012) for his work in the field of advanced medical technology.

4.    In the course of his medical practice within the Central District during the time period approximately June 2012 through May 2014, Dr. Shahinian repeatedly purchased and made use of the High Performance medical gowns manufactured and sold by Kimberly-Clark that are at issue in this lawsuit.

5.    Plaintiff Prime Healthcare Centinela, LLC ("Prime Healthcare Centinela") is a Delaware limited liability company whose principal place of business is located in the County of Los Angeles, State of California, within the Central District.

6.      Plaintiff Prime Healthcare Services – Garden Grove, LLC ("Prime Healthcare Garden Grove") is a Delaware limited liability company whose principal place of business is located in the County of Orange, State of California, within the Central District.

7.      Plaintiff Bahamas Surgery Center, LLC dba Bahamas Surgery Center ("Bahamas Surgery Center") is a California limited liability company whose principal place of business is located in Kern County, State of California.

8.      Plaintiffs Dr. Shahinian, Prime Healthcare Centinela, Prime Healthcare Garden Grove, and Bahamas Surgery Center shall collectively be referred to hereinafter as the "California Plaintiffs."

9.      Plaintiff Prime Healthcare Services – Harlingen, LLC ("Prime Healthcare Harlingen") is a Delaware limited liability company whose principal place of business is located in the city of Harlingen, State of Texas.

10.     Plaintiff Knapp Medical Center, LLC ("Knapp Medical Center") is a Texas limited liability company whose principal place of business is located in the city of Weslaco, State of Texas.

11.     Plaintiff Prime Healthcare Services – Landmark, LLC ("Prime Healthcare Landmark") is a Delaware limited liability company whose principal place of business is located in the city of Woonsocket, State of Rhode Island.

12.     Kimberly-Clark is a Delaware corporation with its principal executive offices located in Dallas, Texas.  Kimberly-Clark describes itself as a global company focusing on leading the world in essentials for a better life through product innovation and building its personal care, consumer tissue, K-C Professional, and healthcare brands.  Kimberly-Clark is principally engaged in the manufacturing and marketing of a wide range of products mostly made from natural or synthetic fibers using advanced technologies in fibers, nonwovens, and absorbency.  Kimberly-Clark owns several well-recognized consumer brands in the field of personal care and tissues, including,

among others, Huggies, Pull-Ups, Kotex, Depend, Kleenex, Scott, Cottonelle, Viva, and other brand names.

13.   Among its business segments, Kimberly-Clark operated a healthcare segment, which it described as providing "essentials that help restore patients to better health and improve the quality of patients' lives."  In 2013, Kimberly-Clark reported net sales of over $1.6 billion from its healthcare segment alone.  This segment was focused on the sale of surgical and infection prevention products for the operating room and other medical supplies, and medical devices focused on pain management, respiratory, and digestive health.  Kimberly-Clark described itself as "a global leader in education to prevent healthcare-associated infections."  Kimberly-Clark's healthcare products were sold under the "Kimberly-Clark" and "ON-Q" brand names.  Its healthcare products included medical exam gloves, facial masks and respirators, and surgical drapes and gowns.  According to its 2013 Annual Report, Kimberly-Clark sold its products to, among other entities, "healthcare establishments and high volume public facilities."  On information and belief, during all relevant times, Kimberly-Clark's market share of the surgical gown market at issue in this lawsuit exceeded 50%.

14.   Defendant Halyard is a Delaware corporation with its principal executive offices located in Alpharetta, Georgia.  Halyard describes itself as a global company which seeks to advance health and healthcare by preventing infection, eliminating pain, and speeding recovery.  Halyard sells its products in more than 100 countries.  It claims that it markets and supports the efficacy, safety, and economic benefit of its products with a significant body of clinical evidence.  Halyard has two business segments: Surgical and Infection Prevention, and Medical Devices.

15.   Halyard is a publicly traded spin-off company of the healthcare division of Kimberly-Clark known as Kimberly-Clark Health Care.  The spin-off was completed on or about October 31, 2014.  Since that date, Halyard, as opposed to Kimberly-Clark, has sold the "MICROCOOL[*] Breathable High Performance Surgical Gowns" (hereafter, the "High Performance Gowns" or "MICROCOOL").   Halyard was

incorporated in February 2014 in anticipation of the spin-off and Kimberly-Clark transferred its healthcare business to Halyard, including the transfer of employees with knowledge relevant to the allegations and conduct described herein, prior to the spin-off.  Therefore, the knowledge of Kimberly-Clark Health Care and its employees, executives, executive officers, and others alleged in this Second Amended Complaint is imputed to Halyard and its employees, executives, executive officers, and others, and Halyard is thus liable for the acts and omissions alleged in this Second Amended Complaint occurring prior to the spin-off.  Halyard is also liable for the acts and omissions as alleged in this Second Amended Complaint occurring after the completion of the spin-off.

16.    The true names and capacities of defendants DOES 1 through 100, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiffs, who therefore sue said defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each of the defendants designated herein as DOE are in some manner responsible for the acts and occurrences set forth herein.  Plaintiffs will seek leave of court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 100, inclusive, as well as the manner in which each DOE defendant is responsible, when the same have been ascertained.

17.    Plaintiffs are informed and believe, and upon such basis allege, that at all times herein mentioned, each of the Defendants herein was an agent, servant, employee, co-conspirator, partner, joint venturer, wholly owned and controlled subsidiary and/or alter ego of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, conspiracy, partnership and/or joint venture.

18.    Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein.  In taking action, as particularized herein,

to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## III.   JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332 because there are over 100 members of the proposed class, at least one member of the proposed class has a different citizenship from a defendant and the total matter in controversy exceeds $5,000,000.

20.    Venue is proper pursuant to 28 U.S.C. § 1391(b) & (c) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and because Defendant is subject to the Court's personal jurisdiction in this judicial district.

## IV.   GENERAL ALLEGATIONS

21.    As noted above, this action is brought against Defendants for marketing and selling medical/surgical gowns as meeting AAMI Level 4 standards, being impermeable and providing the highest level of protection from the transfer of bodily fluids, bacteria, and infection between patient and healthcare professional.  In reality, Defendants have known since at least as early as 2012 that these gowns failed industry tests and do not meet relevant standards.

### A.    Defendants' Representations Concerning the Impermeability and Liquid Barrier Protection of the High Performance Gowns.

22.    From approximately 2011 to the present and continuing, Defendants have promoted, marketed, and offered for sale to consumers, patients, doctors, clinics, and

healthcare facilities worldwide surgical gowns sold under the name "MICROCOOL[*] Breathable High Performance Surgical Gowns" (hereafter, the "High Performance Gowns" or "MICROCOOL").   Defendants uniformly claimed to their prospective customers that the High Performance Gowns provide the highest level of liquid barrier protection available.   According to Defendants, the High Performance Gowns are "AAMI Level 4."   Indeed, in a press release introducing the High Performance Gowns, Kimberly-Clark stated they met the AAMI Level 4 Standard for liquid barrier protection and represented that the "gown helps prevent blood and other bodily fluids from penetrating through to the clinician's skin during any procedure and is specifically designed for the most demanding and fluid-intensive procedures."   Kimberly-Clark's Vice President of Global Sales and Marketing, Mr. John Amat, was quoted as saying "[t]he gown delivers surgeons and surgical staff a full spectrum of protection and the assurance of barrier integrity, allowing them to concentrate solely on patient care during long and stressful procedures and not on their risk of exposure."   Attached as Exhibit A and incorporated herein by this reference is a true and correct copy of the press release dated May 16, 2011.

23.   "AAMI" stands for the Association for the Advancement of Medical Instrumentation.   AAMI developed the liquid barrier standard to assist healthcare personnel in the selection and use of surgical gowns, drapes, and other protective apparel.   "AAMI Level 4" refers to the AAMI Level 4 Liquid Barrier Standard.   AAMI performance levels range from 1 (least protective) to 4 (most protective).   AAMI guidelines are a widely accepted system of classification for protective apparel and drapes based on liquid barrier performance.   Therefore, by claiming the High Performance Gowns are AAMI Level 4 gowns, Defendants represent that they provide "the highest barrier protection rating available for gowns."   Defendants further represent that the High Performance Gowns provide "Level 4" liquid barrier protection to "critical zones." These "critical zones," according to Defendants, include the front area of the gown from chest to knees and "the sleeves from the cuff to above the

elbow."  Attached as Exhibit B and incorporated herein by this reference is a true and correct copy of Kimberly-Clark's full description of the High Performance Gowns, available on its website as of the original filing date of the Complaint in this action.

24.    Defendants also represent that the High Performance Gowns are impermeable and meet and exceed:  (a) ANSI/AAMI PB70; (b) ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing; and (c) the ASTM F1671 standard for bacteriophage penetration, as well as the European Norms (ENISO 22610) for resistance to wet microbial penetration.

25.    ANSI/AAMI PB70 is set forth in a document published by AAMI entitled "Liquid barrier performance and classification of protective apparel and drapes intended for use in healthcare facilities."   The document discusses a standard establishing minimum barrier performance requirements, a classification system, and associated labeling requirements for protective apparel, surgical drapes, and drape accessories intended for use in healthcare facilities.

26.    ASTM F1670 and ASTM F1671 refer to standard test methods for the resistance of materials used in protective clothing to penetration by synthetic blood and blood-borne pathogens.   The methods are based on a test method for measuring resistance of chemical protective clothing materials to penetration by liquids.  They are normally used to evaluate specimens from individual finished items of protective clothing, including gowns and their seamed and other discontinuous regions, and individual samples of materials that are candidates for items of protective clothing.

27.    From a regulatory perspective, Defendants knew at all relevant times that surgical gowns such as the High Performance Gowns at issue, are "class II" devices that fall under the classification of "surgical apparel" pursuant to 21 C.F.R.§ 878.4040. The regulation describes surgical apparel as follows:

> Surgical apparel are devices that are intended to be worn by operating room personnel during surgical procedures **to protect both the surgical patient and the operating room personnel from transfer of microorganisms, body fluids,**

**and particulate material**.  Examples include surgical caps, hoods, masks, gowns, operating room shoes and shoe covers, and isolation masks and gowns.  Surgical suits and dresses, commonly known as scrub suits, are excluded.  21 C.F.R. § 878.4040 (emphasis added).

28.    Thus, in its submission to the FDA in connection with the gowns at issue, Kimberly-Clark described the intended use of the gowns as follows:

The Kimberly-Clark[*] MicroCOOL[*] Breathable High Performance Surgical Gowns, are sterile, single use surgical apparel intended to be worn by healthcare professionals to **help protect both the patient and the healthcare worker from the transfer of microorganisms, body fluids, and particulate matter**.  The MicroCool Breathable High Performance Surgical Gowns meet the Level 4 requirements of the AAMI Liquid Barrier classifications.  (emphasis added).

29.    With respect to testing of the High Performance Gowns, Kimberly-Clark represented to the FDA as follows:

The Kimberly-Clark[*] MicroCool[*] Breathable High Performance Surgical Gown, has been tested in compliance with the requirements of Level 4 liquid barrier performance requirements of ANSI/AAMI PB70:2003 "*Liquid barrier performance and classification of protective apparel and drapes intended for use in healthcare facilities.*"  The MicroCool[*] Breathable High Performance Surgical Gown also meets the requirements of ASTM1671:2003 *Standard test method for resistance of materials used in protective clothing to penetration by blood-borne pathogens using Phi-X174 bacteriophage penetration as a test system.*  The MicroCool[*] Breathable High Performance Surgical Gown also meets the requirements of Flame Resistant CPSC 1610 Class 1.  The MicroCool[*] Breathable High Performance Surgical Gown has also been tested in compliance with the biocompatibility requirements of ISO 10993 for surface devices with limited contact with breached or compromised surfaces.  All results of testing met acceptance criteria.

**B.** **Defendants Knew the High Performance Gowns Were Not Impermeable and Did Not Meet AAMI Level 4, But Claimed Otherwise and Failed to Disclose the Truth.**

30.     Defendants' representations concerning the level of protection of the High Performance Gowns are not true, and Defendants have known they are not true since at least 2013.     Despite this knowledge, Defendants have not corrected their representations, have not stopped selling the High Performance Gowns, have not recalled the High Performance Gowns they have already sold and/or caused to be placed in the distribution channel, have not reported the truth to the FDA, and have not alerted their customers that have purchased these gowns that the gowns were not and are not as represented.  In fact, not only do the High Performance Gowns not *meet* the relevant standards for liquid barrier protection, Kimberly-Clark has known since at least 2013 that its High Performance Gowns have *failed* the relevant tests, do not meet AAMI Level 4 and, thus, pose a serious risk of causing physicians, healthcare professionals and patients to be unknowingly exposed to serious bacteria, viruses and illness, including but not limited to Ebola, and further causing such individuals to contract such diseases without warning.

31.     In or around 2013 at the latest, Kimberly-Clark became aware of failed test results for the High Performance Gowns.  By way of example only, through receipt and review of a detailed Test Report completed by Adrian Buzea and Susan Tousignant of Intertek Laboratory located in Cortland, New York (Report No. G100999513CRT-001 dated December 27, 2012), Kimberly-Clark learned that the High Performance Gowns were not as claimed and were not as Kimberly-Clark was leading its customers to believe.  During tests conducted by Intertek, one of the leading laboratories in the world, ASTM F1671 tests of approximately 96 random samples of the High Performance Gowns from multiple separate manufacturing lots were conducted, *with over 48 of the gowns failing the test and no fewer than 32 of those gowns experiencing catastrophic failures*.  Indeed, among other things, the tests revealed that the gowns

allowed liquid and bacterial and viral pathogens to penetrate the gowns, thus placing physicians, healthcare professionals and patients at considerable risk. This failure rate of approximately 50% is nothing short of shocking and greatly exceeds failure rates acceptable for satisfying AAMI Level 4 standards.

32.    As a result of these failed test results, Defendants knew that they could no longer honestly represent the High Performance Gowns as being "impermeable," of meeting AAMI Level 4, of meeting ASTM F1670 and F1671 testing standards, and/or of satisfying ANSI/AAMI PB70. They also knew that certain of their representations to the FDA regarding the gowns were false. Defendants also knew they should take immediate action to announce that the High Performance Gowns did not meet appropriate standards; recall the gowns; alert Federal, State and local governments and the FDA; alert physicians, healthcare professionals and patients worldwide; and undertake efforts to immediately cause the gowns to be removed from the shelves and distribution channels of healthcare facilities and distributors worldwide. In short, Defendants knew as of 2013 at the latest and likely well over a year earlier that the High Performance Gowns are not safe for the intended uses and place both patients *and* healthcare professionals at risk of serious infection and bodily harm.

33.    However, instead of taking appropriate and immediate action to protect healthcare professionals and the public at large, Defendants did nothing of the sort. Defendants did not disclose the truth to Plaintiffs and others regarding the gowns; did not stop making its false representations to Plaintiffs and others regarding the gowns, did not recall the gowns; did not alert Federal, State and local governments and the FDA; did not alert physicians, healthcare professionals and patients worldwide; and did not undertake efforts to immediately cause the gowns to be removed from the shelves and distribution channels of healthcare facilities and distributors worldwide.

**SECOND AMENDED CLASS ACTION COMPLAINT**

**C.**   **Defendants Chose To Place Profits Over Quality and The Protection of Plaintiffs and Others by Shifting Their Testing Process to Temporary Contractors.**

34.   The independent test results from Intertek should have come as little surprise to Defendants.  At all times relevant to this complaint, Defendants produced much of the non-woven fabric for the MICROCOOL gowns at various of their manufacturing facilities, including at their approximately 616,000 square foot facility in La Grange, Georgia ("La Grange Mill").  The La Grange Mill is a vertically integrated manufacturing facility meaning that it converts raw materials into finished MICROCOOL fabric all within the mill.

35.   A critical part of manufacturing MICROCOOL non-woven fabric is rigorous and consistent testing, which is supposed to be conducted before it gets shipped to other of Defendants' facilities, including one located in Honduras, to be finished into surgical gowns and drapes.  This quality control testing is required to take place on-site and involves a series of tests on the non-woven fabric to assure that when fabricated into finished gowns and drapes, it will comply with, among other things, AAMI Level 4 requirements.

36.   As part of these quality control procedures, Defendants are supposed to test the MICROCOOL non-woven fabric for, among other things, static electricity, color, blood strike through, strength, and liquid impact penetration.  These tests were supposed to be performed at an onsite quality control laboratory.

37.   For most of the history of the La Grange Mill, these tests had been performed by Defendants' employees.  In general, these were long-term employees of the La Grange Mill, were well trained, and had worked in a variety jobs within the La Grange Mill that contributed to their understanding of processes and quality challenges associated with producing non-woven fabric intended for a surgical environment.

38.   In approximately late 2010 to early 2011, however, Kimberly-Clark chose profits over quality and the protection of healthcare workers by shifting away from

using exclusively Kimberly-Clark employees to maintain quality of the MICROCOOL gowns.   Instead, Kimberly-Clark assigned much of the quality control function to contract workers who were not Kimberly-Clark employees.   These contract workers were not as well paid as Kimberly-Clark employees, were not as experienced as Kimberly-Clark employees, were not properly trained, and had a much higher turnover rate than Kimberly-Clark employees.   The primary, if not sole, reason for this shift was for Kimberly-Clark to reduce expenses and increase profits.

39.    Prior to Kimberly-Clark deploying these lower-paid contract workers into the quality control function, Kimberly-Clark managers were warned by existing Kimberly-Clark quality control employees that the use of these contractors to perform quality control was a mistake with significant consequences and that it would result in diminished quality of Kimberly-Clark's non-woven fabrics, including MICROCOOL, and thus placing healthcare professionals, including Plaintiff, at undue risk. Notwithstanding these objections and warnings, Kimberly-Clark managers, in an effort to boost profits, overruled these objections and substituted these lower-paid and less experienced contract workers for Kimberly-Clark employees in the quality control laboratory.

40.    As a result of this substitution, the quality of non-woven fabrics, including MICROCOOL, has suffered.  This reduction on quality control has led to a reduction in quality, which in turn contributed to the failure of the High Performance Gowns described above.

### D.    <u>Kimberly-Clark, Its Distributor and Others Agreed to Purposely Conceal the Truth About The High Performance Gowns.</u>

41.    In early 2013 at the latest, in an effort to place their own monetary self-interest ahead of the welfare of the general public and healthcare professionals worldwide, Kimberly-Clark together with at least one of its major distributors, Cardinal Health 200, LLC, and certain of its employees, executives, executive officers (e.g.

Executive Vice President Joanne Bauer), agents, and others took affirmative steps to conceal, not disclose and cover-up their knowledge of the true condition of the High Performance Gowns, as well as the Intertek test results, and purposely avoid and/or delay the disclosure of the truth about the problems with its gowns from Plaintiffs, other healthcare professionals, the government and the general public.

**E.    The Continued Sale of the High Performance Gowns Creates an Ongoing and Unacceptable Risk of Harm to Patients and Healthcare Workers.**

42.    Despite its knowledge as to its prior false representations and concealment, in relatively recent public statements, Kimberly-Clark has nevertheless represented that the High Performance Gowns are *safe to use in connection with patients suspected of contracting the Ebola virus*.  Kimberly-Clark's website stated as follows:

> As concerns around the spread of the Ebola virus continue to grow, the number of inquiries we receive regarding recommendations for PPE [i.e., "Personal Protective Equipment"] and our plans for Pandemic Preparedness are growing in tandem.   Therefore, we want to proactively provide you with guidance on preparing for a pandemic **as well as solutions for proper PPE**.  We are providing you with a clinical Kimberly-Clark Ebola Virus Precautions Brief and a Kimberly-Clark Personal Protection Solutions guide as well as other resources to answer questions you have about the Ebola Virus Disease.

43.    Below this statement on its website, Kimberly-Clark shared a link inviting visitors to download the "Kimberly-Clark Personal Protection Solutions Guide," which advised healthcare facilities to use the High Performance Gowns in connection with treating patients who may be infected with the Ebola virus.  The link to this list of Kimberly-Clark products, which included the High Performance Gowns, was also available on Kimberly-Clark's letter to customers entitled the "Kimberly-Clark Pandemic Preparedness Customer Letter" dated August 14, 2014.  Attached hereto as

Exhibit C and incorporated herein by this reference is a true and correct copy of a page relating to Ebola preparedness available on Kimberly-Clark's website.  Attached hereto as Exhibit D is a true and correct copy of Kimberly-Clark's August 14, 2014 letter posted on its website.  Attached hereto as Exhibit E and incorporated herein by this reference is a true and correct copy of the list of Kimberly-Clark "Personal Protective Equipment" products, which include the High Performance Gowns and which Kimberly-Clark recommended in connection with the treatment of suspected or confirmed Ebola patients.

44.   Further, on September 19, 2014, Kimberly-Clark issued a document entitled "Kimberly-Clark Ebola Virus Disease (EVD) Precautions Brief."   In this document, Kimberly-Clark provided a list of recommendations for "Personal Protection" from the Ebola virus, as well as the use of "appropriate personal protective equipment (PPE)."  With respect to surgical gowns, Kimberly-Clark advised healthcare professionals to use "Level 4" gowns—the represented clearance level for the High Performance Gowns—for working with Ebola patients.  Attached hereto as Exhibit F and incorporated herein by this reference is a true and correct copy of this document.

45.   In short, despite knowing since at least 2013 that its High Performance Gowns failed industry tests and were at risk for allowing bodily fluid, bacteria, and other harmful matter to pass between patients and healthcare professionals, Defendants have recommended these gowns are safe for use in high-risk medical environments, including when treating Ebola.   Defendants' recklessness and indifference to the prospect that it is responsible for placing patients and healthcare professionals at great and unnecessary risk of infection and bodily harm is nothing short of astonishing and, more to the point, utterly reprehensible.

46.   On October 10, 2014, AAMI issued a press release entitled "Surgery Protocol for Ebola Includes AAMI Gown Standard."   In the press release, AAMI recommended that surgeons and healthcare professionals wear "AAMI Level 4" surgical gowns and drapes when operating on suspected or confirmed Ebola patients.

On October 21, 2014, the American College of Surgeons issued a statement echoing the AAMI guidance by advising that due to the significant risk of exposure to blood or bodily fluids, all operating room personnel should wear "AAMI Level 4" impervious surgical gowns.  Again, while the public and the healthcare community is being led to believe that "AAMI Level 4" gowns manufactured and distributed by Defendants are safe for Ebola patients or other sensitive operations, and Defendants' gowns have met critical industry standards and are "impermeable," Defendants together with certain of its employees, executives, agents, distributors, and others have been silent in disclosing the truth.

## F.   **Plaintiffs Purchased the High Performance Gowns.**

47.    Plaintiff Dr. Shahinian repeatedly purchased and made use of the High Performance Gowns in Los Angeles, California during the time period approximately June 2012 through May 2014.

48.    As reflected in Defendants' internal documents, Plaintiff Prime Healthcare Centinela purchased and made use of the High Performance Gowns within the County of Los Angeles, State of California, in the Central District during the class period alleged below.

49.    As reflected in Defendants' internal documents, Plaintiff Prime Healthcare Garden Grove purchased and made use of the High Performance Gowns within the County of Orange, State of California, in the Central District during the class period alleged below.

50.    As reflected in Defendants' internal documents, Plaintiff Bahamas Surgery Center purchased and made use of the High Performance Gowns within the State of California during the class period.

51.    As reflected in Defendants' internal documents, Plaintiff Prime Healthcare Harlingen purchased and made use of the High Performance Gowns within the State of Texas during the class period.

52.     As reflected in Defendants' internal documents, Plaintiff Knapp Medical Center purchased and made use of the High Performance Gowns within the State of Texas during the class period.

53.     As reflected in Defendants' internal documents, Plaintiff Prime Healthcare Landmark purchased and made use of the High Performance Gowns within the State of Rhode Island during the class period.

54.     Plaintiffs made these purchases and used these gowns in reliance on Defendants' representations regarding the gowns (a) meeting AAMI Level 4 standards; (b) being impermeable; (c) providing the highest level of liquid barrier protection available; (d) helping prevent blood and other bodily fluids from penetrating through to the clinician's skin during any procedure and being specifically designed for the most demanding and fluid-intensive procedures; (e) meeting the highest barrier protection rating available for gowns; and (f) providing AAMI Level 4 liquid barrier protection to "critical zones", including the front area of the gown from the chest to knees and the sleeves from the cuff to above the elbow.  Had Plaintiffs know the truth about the gowns and Defendants' misrepresentations and concealment as described above, he would not have purchased or made use of the gowns.

## V.     CLASS ACTION ALLEGATIONS

### Fed. R. Civ. Proc. 23(b)(2)

55.     Plaintiffs bring this action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and all purchasers and users, including entities and natural persons, in the United States who purchased or used the High Performance Gowns from 2011 up to and including December 11, 2015 (the "Injunctive Relief Class"), with the following subclasses:

(a)     California Injunctive Relief Subclass: All purchasers and users, including entities and natural persons in California, who purchased

or used the High Performance Gowns from 2011 up to and including December 11, 2015 (the "California Injunctive Relief Subclass").

(b) Texas Injunctive Relief Subclass: All purchasers and users, including entities and natural persons in Texas, who purchased or used the High Performance Gowns from 2011 up to and including December 11, 2015 (the "Texas Injunctive Relief Subclass").

(c) Rhode Island Injunctive Relief Subclass: All purchasers and users, including entities and natural persons in Rhode Island, who purchased or used the High Performance Gowns from 2011 up to and including December 11, 2015 (the "Rhode Island Injunctive Relief Subclass").

56. Excluded from the Injunctive Relief Class, the California Injunctive Relief Subclass, the Texas Injunctive Relief Subclass, and the Rhode Island Injunctive Relief Subclass, is (a) any governmental entity; (b) any person or entity in which any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff, have any controlling interest; and (c) any partner or employee of Class Counsel.

57. Class certification is proper under Rule 23 of the Federal Rules of Civil Procedure because Defendants have acted (or refused to act) on grounds generally applicable to the Injunctive Relief Class, the California Injunctive Release Subclass, the Texas Injunctive Relief Subclass, and the Rhode Island Injunctive Relief Subclass, thereby making appropriate injunctive relief with respect to the classes as a whole.

58. Plaintiffs reserve the right to modify the definition of the Injunctive Relief Class, the California Injunctive Relief Subclass, the Texas Injunctive Relief Subclass, and the Rhode Island Injunctive Relief Subclass, after further discovery. Plaintiffs further reserve the right to only seek class certification under Rule 23(b)(2) for injunctive relief and not to seek class certification under Rule 23(b)(3) for monetary damages.

**Fed. R. Civ. Proc. 23(b)(3)**

59.     Plaintiffs separately bring this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all purchasers and users, including entities and natural persons, in the United States who purchased or used the High Performance Gowns from 2011 up to and including December 11, 2015 (the "Damages Class"), with the following subclasses:

(a)     California Damages Subclass: All purchasers and users, including entities and natural persons in California, who purchased or used the High Performance Gowns from 2011 up to and including December 11, 2015 (the "California Damages Subclass").

(b)     Texas Damages Subclass: All purchasers and users, including entities and natural persons in Texas, who purchased or used the High Performance Gowns from 2011 up to and including December 11, 2015 (the "Texas Damages Subclass").

(c)     Rhode Island Damages Subclass: All purchasers and users, including entities and natural persons in Rhode Island, who purchased or used the High Performance Gowns from 2011 up to and including December 11, 2015 (the "Rhode Island Damages Subclass").

60.     Excluded from the Damages Class, the California Damages Subclass, the Texas Damages Subclass, and the Rhode Island Damages Subclass, is (a) any governmental entity; (b) any person or entity in which any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff, have any controlling interest; and (c) any partner or employee of Class Counsel.

61.     Questions of law or fact common to Damages Class, the California Damages Subclass, the Texas Damages Subclass, and the Rhode Island Damages Subclass, predominate over any questions affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

62.     Plaintiffs reserve the right to modify the definition of the Damages Class, the California Damages Subclass, the Texas Damages Subclass, and the Rhode Island Damages Subclass, after further discovery.   As indicated above, Plaintiffs further reserve the right to only seek class certification under Rule 23(b)(2) for injunctive relief and not to seek class certification under Rule 23(b)(3) for monetary damages.

## **Fed. R. Civ. Proc. 23(a) Prerequisites**

63.     The Injunctive Relief Class and Damages Class and related subclasses are sometimes referred to collectively herein as the "Class" and the members of these classes as "Class Members."

64.     <u>Numerosity of the Class</u>.   The Class is so numerous that joinder of all members in one action is impracticable.   While the exact number and identities of the Class Members are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe and therefore allege that there are in excess of 500,000 members of the Class.

65.     <u>Typicality of Claims</u>.   Plaintiffs' claims are typical of those of other Class Members, all of whom have suffered similar harm due to Defendants' course of conduct as described herein.

66.     <u>Adequacy of Representation</u>.   Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.   Plaintiffs have retained attorneys who are highly experienced in the handling of class actions, and Plaintiffs and their counsel intend to prosecute this action vigorously.

67.     <u>Predominance of Common Questions of Law or Fact</u>.   Common questions of fact and law exist as to all Class Members that predominate over any questions affecting only individual Class Members.   These common legal and factual questions, which do not vary among Class Members, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following:

(a)    Whether Defendants falsely represented that the High Performance Gowns meet AAMI Level 4 Liquid Barrier Standards;

(b)    Whether Defendants falsely represented that the High Performance Gowns are impermeable and protect both the surgical patient and the operating room personnel from transfer of microorganisms, body fluids, and particulate material;

(c)    Whether Defendants falsely represented that the High Performance Gowns provide "Level 4" liquid barrier protection to "critical zones," which include "the sleeves from the cuff to above the elbow";

(d)    Whether and when Defendants learned that the above representations were false;

(e)    Whether Defendants had a duty to disclose to their customers, patients, the government, healthcare professionals, and/or the general public that the above representations were false;

(f)    Whether the above representations and known problems with the gowns were material;

(g)    Whether Defendants intentionally or recklessly concealed that the High Performance Gowns were not impermeable, did not meet AAMI Level 4 Liquid Barrier Standards, and did not provide "Level 4" liquid barrier protection to all "critical zones";

(h)    Whether Defendants had any reasonable grounds for believing the representations described above were true when they made them;

(i)    Whether Defendants' conduct was undertaken with conscious disregard of the rights of the members of the Class, and was done with fraud, oppression, and/or malice;

**SECOND AMENDED CLASS ACTION COMPLAINT**

(j)   Whether injunctive relief is appropriate and necessary to enjoin Defendants from selling the High Performance Gowns as AAMI Level 4 gowns;

(k)   Whether Defendants' disclosures regarding the lack of liquid barrier protection afforded by the High Performance Gowns were inadequate so as to be false, deceptive, and/or unfair;

(l)   Whether Defendants' conduct caused harm to the Class;

(m)   Whether the members of the Class are entitled to restitution and/or suffered damages.

68.   <u>Superiority</u>.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because individual litigation of the claims of all Class Members is impracticable.   Requiring each individual class member to file an individual lawsuit would unreasonably consume the amounts that may be recovered.   Even if every Class Member could afford individual litigation, the adjudication of hundreds of thousands of identical claims would be unduly burdensome to the courts.   Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.   By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the Class Members.   Plaintiffs anticipate no difficulty in the management of this action as a class action.   The prosecution of separate actions by individual Class Members may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class Members not parties to such adjudications or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

## VI.   CLAIMS FOR RELIEF

### COUNT ONE

### FRAUD (AFFIRMATIVE MISREPRESENTATIONS)

69.   Plaintiffs restate and re-allege paragraphs 1 through 68 as if fully set forth herein.

70.   Defendants uniformly represented that the High Performance Gowns:

(a)   meet AAMI Level 4 Liquid Barrier Standards;

(b)   meet ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing;

(c)   meet ASTM F1671 standards for bacteriophage penetration, as well as the European Norms (ENISO 22610) for resistance to wet microbial penetration;

(d)   provide "Level 4" liquid barrier protection to "critical zones," which include the front area of the gown from chest to knees and "the sleeves from the cuff to above the elbow";

(e)   are impermeable and protect both the patient and healthcare personnel from transfer of microorganisms, body fluids, and particulate material;

(f)   will not leak bodily fluids or pass bacterial organisms either from the healthcare worker to the patient, or vice versa, and are safe for use in the treatment of patients with infectious diseases or whose treatment require a sterile environment; and/or

(g)   provide the highest level of liquid barrier protection such that the gowns are recommended in the treatment of suspected or confirmed Ebola patients.

71.     Each of Defendants' representations described above were false. Defendants intentionally and/or recklessly misrepresented the material facts set forth above.  The true facts include, among other things, that the High Performance Gowns:

(a)     failed ASTM F1671 tests at rates that exceeded failure rates acceptable for satisfying AAMI Level 4 standards, and the tests revealed that liquid and bacterial matter penetrated the gowns;

(b)     did not meet AAMI Level 4 Liquid Barrier Standards;

(c)     did not meet ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing;

(d)     did not meet ASTM F1671 standards for bacteriophage penetration, as well as the European Norms (ENISO 22610) for resistance to wet microbial penetration;

(e)     were not impermeable and would not protect both the patient and healthcare personnel from transfer of microorganisms, body fluids, and particulate material;

(f)     would not provide "Level 4" liquid barrier protection to the "critical zone" of "the sleeves from the cuff to above the elbow";

(g)     would not prevent the leakage of bodily fluids or the passing of bacterial organisms between healthcare professionals and patients, and was not safe for use in the treatment of patients with infectious diseases or whose treatment require a sterile environment; and/or

(h)     would not provide the highest level of liquid barrier protection such that the gowns are recommended in the treatment of suspected or confirmed Ebola patients.

72.     Defendants' statements were made with the intent to deceive Plaintiffs and the Class, and to induce Plaintiffs and the Class to purchase and use the gowns in reliance thereon.

73.   Plaintiffs and the Class, at the time these representations were made by Defendants, and at the time Plaintiffs and the Class took the actions herein alleged, were ignorant of the falsity of Defendants' representations and believed them to be true. Plaintiffs and the Class relied on Defendants' representations and had Plaintiffs and the Class known of the actual facts, Plaintiffs and the Class would not have taken the actions they did, including but not limited to purchasing the High Performance Gowns and using the High Performance Gowns in the treatment of patients.  Plaintiffs and the Class' reliance on Defendants' representations was justified.

74.   As a direct and proximate result of the above, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

75.   Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, oppression, and/or malice.  This despicable conduct subjected Plaintiffs and the Class to cruel and unjust hardship so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future.  Therefore, Plaintiffs and the Class are also entitled to punitive damages against Defendants in an amount to be determined at trial.

## COUNT TWO

### FRAUDULENT CONCEALMENT/NON-DISCLOSURE

76.   Plaintiffs restate and re-allege paragraphs 1 through 75 as if fully set forth herein

77.   As alleged above, Defendants made a number of representations concerning the High Performance Gowns, including that the High Performance Gowns are impermeable, meet AAMI Level 4 Liquid Barrier Standards, meet ASTM F1670 and ASTM F1671 standards, and provide "Level 4" liquid barrier protection to "critical zones," which include "the sleeves from the cuff to above the elbow."

78.     Defendants' representations described above were false.  However, despite knowing of the falsity of their representations at least as of 2013, Defendants concealed, and/or failed to disclose material and contrary facts set forth above, including, among other things, that the High Performance Gowns:

(a)     failed ASTM F1671 tests at rates that exceeded failure rates acceptable for satisfying AAMI Level 4 standards, and the tests revealed that liquid and bacterial matter penetrated the gowns;

(b)     did not meet AAMI Level 4 Liquid Barrier Standards;

(c)     did not meet ASTM F1670 and ASTM F1671 standards for resistance of materials used in protective clothing;

(d)     did not meet ASTM F1671 standards for bacteriophage penetration, as well as the European Norms (ENISO 22610) for resistance to wet microbial penetration;

(e)     were not impermeable and would not protect both the surgical patient and the operating room personnel from transfer of microorganisms, body fluids, and particulate material;

(f)     would not provide "Level 4" liquid barrier protection to the "critical zone" of "the sleeves from the cuff to above the elbow";

(g)     would not prevent the leakage of bodily fluids or the passing of bacterial organisms between healthcare professionals and patients, and was not safe for use in the treatment of patients with infectious diseases or whose treatment require a sterile environment; and/or

(h)     would not provide the highest level of liquid barrier protection such that the gowns are recommended in the treatment of suspected or confirmed Ebola patients.

79.     Defendants had a duty to disclose this information to their customers because: (a) it is material information that poses a safety risk to customers and Defendants knew the information was not reasonably discoverable by their customers;

(b) Defendants made affirmative representations that were contrary and misleading without the disclosure of this information; and/or (c) Defendants actively concealed this information from its customers, the government and the public.

80.     Defendants concealed and failed to disclose these material facts with the intent to deceive Plaintiffs and the Class, including but not limited to concealing the failed test results from Intertek.

81.     Defendants' concealments and non-disclosure of material facts as set forth above were made with the intent to induce Plaintiffs and the Class to purchase and use the gowns.

82.     Plaintiffs and the Class, at the time these failures to disclose and suppressions of facts occurred, and at the time Plaintiffs and the Class purchased and used the gowns, were ignorant of the existence of the facts that Defendants suppressed and failed to disclose.   If Plaintiffs and the Class had known of Defendants' concealments and failures to disclose material facts, they would not have taken the actions they did, including but not limited to purchasing the High Performance Gowns and using the High Performance Gowns in the treatment of patients.  Plaintiffs and the Class' reliance was justified and reasonable as they had no basis to doubt the original representations made to them, nor did they have reason to believe they were being misled or material facts were being concealed from them.

83.     As a direct and proximate result of the above, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

84.     Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the rights of Plaintiffs and the Class, and did so with fraud, oppression, and/or malice.  This despicable conduct subjected Plaintiffs and the Class to cruel and unjust hardship so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future.  Therefore, Plaintiffs and the Class are also entitled to punitive damages against Kimberly-Clark in an amount to be determined at trial.

## COUNT THREE

## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE
## SECTION 17200 *ET SEQ.*

### (On Behalf of the California Subclasses Only)

85.     Plaintiffs restate and re-allege paragraphs 1 through 84 as if fully set forth herein.

86.     California Business and Professions Code section 17200 *et seq.*, also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent, or deceptive business act or practice as well as "unfair, deceptive, untrue or misleading advertising."

87.     By engaging in the false, deceptive, and misleading conduct alleged above, Defendants have engaged in unlawful business acts and practices in violation of the UCL, including by violating state and federal laws, including but not limited to 21 U.S.C. § 360; and 21 C.F.R. §§ 803.1 *et seq.*, 21 C.F.R. § 878.4040, and Cal. Bus. & Prof. Code §§ 17500 *et seq.*

88.     Defendants' conduct in misleading the California Plaintiffs and the California Subclasses through their affirmative misrepresentations and failures to disclose material facts to the aforementioned plaintiffs and the California Subclasses, as described above, also constitutes a "fraudulent" and "unfair" business practice within the meaning of the UCL.

89.     The California Plaintiffs and each California Subclass Member suffered an injury in fact and lost money or property as a result of Defendants' unlawful, unfair, and/or fraudulent business practices.

90.     The California Plaintiffs, on behalf of themselves and the California Subclasses, seek restitution and disgorgement of all moneys received by Defendants through the unlawful, fraudulent and unfair conduct described above.

91.     The California Plaintiffs, on behalf of themselves and the California Subclasses, seek a temporary, preliminary, and/or permanent injunction from this Court

prohibiting Defendants from engaging in the patterns and practices described herein, including but not limited to representing that the High Performance gowns are AAMI Level 4 gowns.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

### ON THE FIRST CAUSE OF ACTION FOR FRAUD (AFFIRMATIVE MISREPRESENTATIONS)

1. An Order certifying that the action be maintained as a class action under Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

2. An injunction precluding the wrongful conduct described herein.

3. For compensatory damages in an amount that exceeds $500 million, with the exact amount to be proven at trial.

4. For punitive damages in an amount sufficient to punish Defendants and to defer them from engaging in wrongful conduct in the future.

5. For pre and post judgment interest and costs of suit incurred herein.

6. For attorneys' fees incurred herein, to the extent permitted by law.

7. For such other and further relief as the Court may deem just and proper.

### ON THE SECOND CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT

1. An Order certifying that the action be maintained as a class action under Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

2. An injunction precluding the wrongful conduct described herein.

3. For compensatory damages in an amount that exceeds $500 million, with the exact amount to be proven at trial.

4.      For punitive damages in an amount sufficient to punish Defendants and to defer them from engaging in wrongful conduct in the future.

5.      For pre and post judgment interest and costs of suit incurred herein.

6.      For attorneys' fees incurred herein, to the extent permitted by law.

7.      For such other and further relief as the Court may deem just and proper.

## ON THE THIRD CAUSE OF ACTION FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)

1.      An Order certifying that the action be maintained as a class action under Rule 23(b)(2) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

2.      An injunction precluding the wrongful conduct described herein.

3.      For restitution of moneys paid for property in an amount that exceeds $500 million, with the exact amount to be proven at trial.

4.      An award of equitable and declaratory relief.

5.      For pre and post judgment interest and costs of suit incurred herein.

6.      For attorneys' fees incurred herein, to the extent permitted by law.

7.      For such other and further relief as the Court may deem just and proper.

Dated:  December 11, 2015                    EAGAN AVENATTI, LLP


By:      /s/ Michael J. Avenatti
Michael J. Avenatti
Attorneys for Plaintiffs

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  December 11, 2015                    EAGAN AVENATTI, LLP


By:      /s/ Michael J. Avenatti
Michael J. Avenatti
Attorneys for Plaintiffs

**SECOND AMENDED CLASS ACTION COMPLAINT**