EAGAN AVENATTI, LLP
Michael J. Avenatti, State Bar No. 206929
mavenatti@eaganavenatti.com
Ahmed Ibrahim, State Bar No. 238739
aibrahim@eaganavenatti.com
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Telephone:  949.706.7000
Facsimile:   949.706.7050

Attorneys for Plaintiffs, Individually and On Behalf of All Others Similarly Situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HRAYR SHAHINIAN, M.D., F.A.C.S., et al.,<br><br>              Plaintiffs,<br><br>       vs.<br><br>KIMBERLY-CLARK CORPORATION, a Delaware Corporation, and HALYARD HEALTH, INC., a Delaware Corporation,<br><br>              Defendants. | CASE NO.:  14-CV-08390 DMG (PLA)<br><br>**REBUTTAL DECLARATION OF DENNIS M. MOORE IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>HEARING DATE: August 26, 2016<br>HEARING TIME:  10:00 a.m.<br>LOCATION:       Courtroom 7 |

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

# REBUTTAL DECLARATION OF DENNIS M. MOORE

I, Dennis M. Moore, declare as follows:

1. I have been retained by Eagan Avenatti, LLP in connection with the above entitled action to serve as an expert in opining as to whether a market would exist for purchasers of the MicroCool High Performance Gowns ("MicroCool Gowns") to re-sell or use the gowns (i.e. hospitals, medical clinics, surgery centers, etc.) if in fact they did not meet the AAMI Level 4 liquid barrier standard as Defendants claim. I have personal knowledge of the facts herein and if called to testify would and could competently testify thereto.

## SCOPE OF ASSIGNMENT

2. I was asked by Eagan Avenatti, LLP to respond to (1) Defendants' objections[1] to my initial declaration[2] and (2) the declaration of Phillip J. Phillips.[3] After reviewing the Defendants' objections and declarations, I find that my conclusions remain the same. I consider the Defendants' opinions and discuss why they are fundamentally incorrect, and why I remain convinced of each of my conclusions.

## DEFENDANTS' OBJECTIONS

**A. I am a Regulatory Enforcement Expert.**

---

[1] Defendants' Evidentiary Objections to the Declaration of Dennis M. Moore in the Support of Plaintiffs' Motion for Class Certification (July 8, 2016) (hereinafter "Defendants' Objections").

[2] Declaration of Dennis M. Moore in Support of Plaintiffs' Motion for Class Certification (June 1, 2016) (hereinafter "Moore Declaration").

[3] Declaration of Phillip J. Phillips in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (July 8, 2016) (hereinafter "Phillips Declaration").

1

REBUTTAL DECLARATION OF DENNIS M. MOORE

3. Defendants fundamentally misunderstand my area of expertise. Unlike Mr. Phillips, who is at best a *regulatory affairs* expert, I am *a regulatory enforcement* expert. The two areas are distinct as demonstrated by the difference between my background and that of Mr. Phillips. Mr. Phillips worked for 24 years in the Office of Device Evaluation at the FDA, which he explains "is responsible for the premarket evaluation of all medical devices that are intended for commercial distribution in the United States." [Phillips Decl. ¶ 2.] Mr. Phillips therefore dealt with regulatory issues that arise *before* a medical device has been approved and nothing suggests that he has ever worked in one of the FDA sections that deals with enforcing violation of statutes and regulations *after a device was approved*. Therefore, he has no experience, let alone expertise, in the process of determining whether a drug or device is misbranded or adulterated.

4. My entire career, in contrast, has been focused on regulatory enforcement. When I started my career as a Food and Drug Investigator at California's Department of Health Services in 1984, I was trained in the intricacies of California's Sherman Food, Drug, and Cosmetic Law and the federal Food, Drug, and Cosmetic Act. I necessarily had to become intimately familiar with the federal regulations because they are enmeshed within California law. Health and Safety Code §§ 111245, 111245, 111355, 111375, 111470, and 111550, and countless other sections incorporate and refer to federal laws and regulations. I therefore relied on my knowledge of federal law and regulations during the two decades that I worked for the state. I used this knowledge to conduct inspections; if I was not familiar with the applicable laws, I would not know what to look for during the inspections nor could I have successfully done my job.

5. While I was working for the State of California, the FDA developed an innovative program to use state employees to expand its ranks of inspectors. California took part in the program and I was selected and trained as a Level II FDA Medical Device Investigator. I received the same training that an equivalent FDA employee

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

would receive and gained further knowledge about the nuances of federal medical device law and regulations. At the completion of training, I had the same authority as a federal investigator, and even wore the badge of one. Under the program, my inspections were treated as the equivalent of federal inspections. Defendants are incorrect that I only performed FDA inspections for two years. [Evidentiary Objections at 7.] In fact, I performed them *for 6 years.*

6. In my work for the State of California and the FDA, I had to review the 510k files medical device firms had submitted so I could determine what standards applied to the devices. This was necessary so that I could determine whether a device I was investigating was misbranded or adulterated because it deviated from the 510k specifications. I was also familiar with 21 CFR 812, a section of the federal regulations that deal with investigational devices. Because I at times reviewed investigational devices that were still undergoing clinical trials, I gained experience reviewing the clinical trial plans and investigational device applications for the devices. I needed to understand the scope of the clinical trial to determine whether the medical device firms were acting outside that scope and in fact violating the law. I also had extensive experience reviewing compliance remediation plans and recalls of firms after I had determined they were in violation of the law to determine whether the device firms were in fact following the plans and performing the recalls. As part of my regulatory enforcement duties, I was responsible for the seizure of non-compliant devices that were determined to be adulterated or misbranded in the course of my investigations.

7. Finally, I was responsible for reviewing Corrective and Preventative Actions (CAPA) taken by the device firms. Medical device firms are required to have CAPA policies in place to ensure the firms collect and analyze information, identify and investigate product and quality problems, and take appropriate and effective corrective and/or preventive action to prevent their recurrence. During my investigations, I would ensure that the firms had effective CAPA systems in place, meaning that the firms would identify problems and take steps to prevent them in the future. CAPA systems

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

do not negate regulatory violations medical device firms have committed; rather they are supposed to exist to ensure no further violations occur.

8. Since 2004, I have worked as an industry consultant and used my regulatory enforcement expertise to assist medical device firms in avoiding the commission of violations of federal and state regulatations. One service I have frequently performed is mock compliance review, including mock FDA inspections. For this task, I draw on my experience as a former Food and Drug Investigator and Level II FDA Medical Device Investigator to perform simulated FDA inspections and compliance reviews on my clients. These reviews identify current regulatory violations and areas where I believe my clients are at risk of committing violations in the future. I then assist my clients in developing plans to take corrective action to prevent future violations. However, I warn my clients that even after they have taken corrective action, the FDA or the State of California may become aware of the corrected violations and still take action against the firm.

9. I also advise clients on how to respond to FDA investigations that have been initiated against them. I remind them that while it is important to take corrective actions, the FDA may still decide to punish violations and may seize devices that are not compliant as misbranded or adulterated.

10. I also help my clients write 510k submissions. An important part of this task is ensuring that my clients understand that once they submit the 510k, they are bound by it and risk FDA action against them if they deviate from it.

11. I also plan AAMI and IEC testing schemes for my clients and review their testing data. Ongoing testing plays an important role in the CAPA systems I discussed above. If my clients have an effective testing scheme in place, they can detect products that deviate from the applicable 510k and avoid selling the adulterated and misbranded products.

**B.    I Have Enforcement Experience With Surgical Gowns.**

---

REBUTTAL DECLARATION OF DENNIS M. MOORE

12. Defendants and Mr. Phillips also claim that my expertise is inadequate because I supposedly do not have experience working on matters relating to surgical gowns. They are incorrect. I inspected surgical gown firms as a Food and Drug Investigator and Level II FDA Medical Device Investigator to determine whether they complied with the applicable federal and state regulations. As part of the investigation process, as I explained above, I had to read the 510k files on the gowns of each firm I inspected to determine what the standard was that a defective gown deviated from. However, my experience enforcing gown violations is irrelevant to my expertise. As I explain in greater detail below, there are general statutes and regulations that apply to medical devices as a category. It is under these that the MicroCool gowns would be found misbranded and adulterated if they did not meet the AAMI Level 4 standard.

**C. Defendants and Mr. Phillips Do Not Challenge My Interpretation of, or Experience With, California Medical Device Law.**

13. While Defendants and Mr. Phillips challenge my experience in and interpretation of federal medical device law, they do not do the same for California medical device law. My opinion would remain intact even if I omitted references to federal laws and regulations.

14. Under Cal. Health & Safety Code §111320, "Any device is adulterated that fails to meet the applicable performance standard, if any, as provided in Section 111245."

15. Cal. Health & Safety Code § 111330, a device "is misbranded if its labeling is false or misleading in any particular."

16. Under Cal. Health & Safety Code §111300, it "is unlawful for any person to adulterate any drug or device."

17. Under Cal. Health & Safety Code §111295, it is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is adulterated. Further, under Cal. Health & Safety Code §111305, it is unlawful for any

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

person to receive in commerce any drug or device that is adulterated or to deliver or proffer for delivery any drug or device.

18. Similarly, as to misbranded devices, under Cal. Health & Safety Code § 111440, it is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is misbranded. Further, under Cal. Health & Safety Code §111450, it is unlawful for any person to receive in commerce any drug or device that is misbranded or to deliver or proffer for delivery any drug or device.

19. The causal chain remains intact: if the MicroCool gowns are found to have failed to meet the AAMI Level 4 performance standard, they are adulterated and misbranded. This in turn makes it unlawful to sell, hold, deliver, or receive the gowns, and thus eliminates any legal market for them.

**D. A Medical Device Must Comply With the Performance Standard it Was Cleared Under in its 510k.**

20. Defendants misstate the operation of voluntary consensus standards. [Evidentiary Objections at 12]. Standards organizations, such as AAMI, have developed a number of consensus standards for different types of medical devices. These standards help to create uniform definitions for the applicable devices (i.e. an AAMI Level 4 gown is supposed to meet the AAMI Level 4 standard). Device manufacturers may in some instances choose to have their device cleared by the FDA under a consensus standard when they submit their 510k. Once the device is cleared by the FDA, it is cleared as complying with the consensus standard and therefore must comply with it at all times. Specifically, under 21 U.S.C. § 351, a device is adulterated if it is, or purports to be or is represented as, a device which is subject to a performance standard established under section 360d unless such device is in all respects in conformity with such standard. Thus, device manufacturers choose to bind themselves to the consensus standard they receive clearance under. Mr. Phillips does not appear to actually disagree with my analysis, he simply does not address what occurs after a device has submitted its 510(k). [Phillips Decl. ¶ 25-28.]

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

21. Here, Defendants chose to have their MicroCool gowns cleared under the AAMI Level 4 standard. Gowns sold pursuant to that 510k clearance must therefore be sold under that standard. Other alternative consensus standards may exist (although a device cleared under one consensus standard may not meet the requirements of even similar alternative ones). This is irrelevant, however. If, for example, the MicroCool gowns would have complied with the hypothetical Alpha and Beta standards, Defendants could have chosen to submit the gowns as complying with the Alpha or Beta standard instead of AAMI Level 4 when they submitted their 510k. However, because they did not, the MicroCool gowns were approved under AAMI Level 4, and not Alpha or Beta. Because the gowns were approved under AAMI Level 4 rather than Alpha or Beta, they are misbranded and adulterated if they did not meet AAMI Level 4, even if they would comply with the hypothetical Alpha and Beta standards. The non-compliant MicroCool gowns also could not simply be retroactively and unilaterally classified by Defendants as unrated gowns for the same reason: they were approved to be sold as AAMI Level 4 gowns.

**E. The MicroCool Gowns Cannot Be Sold Because They Are Non-Conforming Products.**

22. Mr. Phillips lays out a number of factors he claims show that the MicroCool Gowns could be sold even if they were non-conforming. As an initial matter, Mr. Phillips appears to restrict his analysis to whether the gowns were non-compliant with the AAMI PB70:2012 standard, which he does not believe is the applicable standard. [Phillips Decl. ¶ 44.] This assumption appears to be the principal basis for his conclusions. [Id. at ¶ 49 ("[I]t is not common industry practice to commence a product recall merely on the basis of failed testing under a voluntary consensus standard, particularly one that is not part of the device's release criteria and/or one that had not yet been recognized by FDA").] My conclusions do not rest on which version of the AAMI standard is in effect and do not take a position on the issue.

---

REBUTTAL DECLARATION OF DENNIS M. MOORE

Rather, my analysis begins with the hypothetical that the gowns simply did not comply with the AAMI Level 4 standard Defendants were bound to comply with.

23. Assuming Mr. Phillips intended his analysis to apply to either version of the standard, it is still incorrect. In my experience as a FDA Level II Field Investigator and California Food and Drug Investigator, California and the FDA would consider medical devices misbranded, adulterated, and unable to be sold in spite of all the factors Mr. Phillips describes. The statutes I described in my original declaration, 21 U.S.C. §§ 331(a), 351, 352, and 334 are separate from those Mr. Phillips discusses and those he discusses are not exceptions.

24. First, Mr. Phillips mentions the FDA's Quality System Regulation (QSR). [Phillips Decl ¶ 47]. However, 21 C.F.R. § 820.100 is just the regulation requiring CAPA, which I discussed above. CAPA is entirely separate from regulatory violations, and the ultimate consequence thereof that the MicroCool Gowns cannot be sold. Manufacturers are required to take steps to identify compliance problems and solve them. Solving these problems does not pardon past violations, however. Devices do not cease to be adulterated and misbranded simply because manufacturers supposedly solve the problem that caused the defect when they produce later batches of the device.

25. Second, Mr. Phillips discusses 21 C.F.R. § 820.100(b) [Phillips Decl ¶ 48], part of the regulation I discussed immediately above, which actually states "All activities required under this section, and their results, shall be documented." The documentation requirement for CAPA, of course, does not mean that misbranded and adulterated medical devices may be sold. It is possible that Mr. Phillips intended to cite to 21 C.F.R. § 820.90(b), a regulation on "nonconformity review and disposition." However, that regulation does not permit the sale of misbranded or adulterated devices, either. Rather, it envisions a scenario where a defective product can be remanufactured into compliance by the device manufacturer. It does not permit a manufacturer to take a defective device and release it as is into the marketplace without any changes to the

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

label to indicate that it is in fact defective. It also requires documentation, which would implicitly have required Defendants to admit that their MicroCool Gowns were in fact defective. Therefore, I did not see anything in Mr. Phillips' declaration suggesting that defendants remanufactured the MicroCool Gowns such that the regulation would apply here.

26. Third, Mr. Phillips states that commencing a product recall is not common when a voluntary testing standard is failed. [Phillips Decl ¶ 49]. First, as stated above, the testing standard at issue here, AAMI 4, was not voluntary for the MicroCool gowns because the gowns were submitted as AAMI 4. In my experience, recalls of medical devices that deviate from their 510k are common. Second, recalls are entirely separate from whether a product is misbranded and cannot be sold; a misbranded or adulterated device cannot be sold regardless of whether there is a recall in effect. Logically, a voluntary recall could not be the determinant of whether a device is misbranded - the manufacturer would simply never perform a recall so that its devices would never be considered misbranded or adulterated. In my experience as a Food and Drug Investigator and Level II FDA Medical Device Investigator, we were often forced to seize and destroy devices in situations where the manufacturer did not perform a recall. Recalls are simply a tool to remove defective devices before they can cause harm. Mr. Phillips notes that manufacturers may sometimes determine a recall is not warranted. [Phillips Decl ¶ 54]. This does not contradict my analysis. The regulatory baseline is that defective products are considered misbranded and adulterated and thus cannot be sold.

27. Mr. Phillips also mentions mandatory recalls [Phillips Decl. ¶ 50], but like voluntary recalls, they are entirely separate from whether a product is misbranded and cannot be sold. Here, of course, the FDA could not have ordered a mandatory recall because, as I understand the allegations Plaintiff intends to prove, Defendants purposely concealed the truth about the gowns' deviance.

**F.   I Did Not Make a Mistake About Which Panel Reviews Surgical Gowns.**

---

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

28. In my original declaration, I stated "Surgical gowns are reviewed by the General & Plastic Surgery Review Panel." I only stated that this panel reviewed them, not that they are the ones who conducted the 510(k) approval for the MicroCool gowns. Defendants claim I am mistaken. [Evidentiary Objections at 8]. They are incorrect. The General and Plastic Surgery Review Panel *does* review surgical gowns.[4] I have never denied that the MicroCool gowns were ultimately approved by the Division of Anesthesiology, General Hospital, Infection Control and Dental Devices.

G. **Misbranded Products Cannot Be Used.**

29. Defendants argue that I incorrectly assumed that surgical gowns must make an AAMI claim to be market and sold. [Evidentiary Objection at 19-20]. They are wrong. Gowns that are submitted for clearance using the AAMI Level 4 Standard to receive approval in their 510k must then meet AAMI Level 4 to be sold. Defendants' examples are not appropriate. The first version of the MicroCool Gown and the Medline Prevention Plus gown do not carry AAMI designations and therefore are not required to comply with the standard. In contrast, the current version of the MicroCool Gown carries the AAMI Level 4 designation and therefore must comply with that standard. If not, it is considered misbranded and/or adulterated, meaning it cannot be used. In other words, there is no legal market for it. Further, when it is misbranded as AAMI Level 4, that does not mean it by default becomes a gown of a lesser AAMI rating (or no AAMI rating) or another gown that can be used for low fluid surgeries. It has to meet the standard it was designed to meet and submitted under. Otherwise, it is a misbranded product that is illegal to sell.

30. To repeat what I stated in my original declaration: Federal law clearly calls out adulteration when a performance standard is not met. Pursuant to 21 U.S.C. § 351, a device is adulterated if it is, or purports to be or is represented as, a device which

---

[4] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpcd/classification.cfm?ID=5226

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

is subject to a performance standard established under section 360d unless such device is in all respects in conformity with such standard.

31. Under 21 U.S.C. § 352, a device is misbranded if its labeling is false or misleading in any particular.

32. These two statutes therefore cause the MicroCool gowns to be misbranded and adulterated. Another statute, 21 U.S.C. § 331, provides that the "following acts and the causing thereof are prohibited:"

> "The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).
>
> "The adulteration or misbranding of any food, drug, device or cosmetic in interstate commerce." 21 U.S.C. § 331(b).
>
> "The receipt in interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise." 21 U.S.C. § 331(c).
>
> "The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded." 21 U.S.C. § 331(k).

33. This means that nearly everyone involved in with the device in interstate commerce, such as manufacturers, packers, distributors, and retailers, is responsible for assuring that he or she is not dealing in products that are adulterated or misbranded, even if someone else caused the adulteration or misbranding in the first place. If you introduce it into interstate commerce or receive it in interstate commerce, you are responsible. The law applies to components and packaging as well as to finished products.

**H.  I Did Not Claim the FDA Regulation of Medical Devices is One Size Fits All.**

---

34. Mr. Phillips believes that I claim the FDA regulates all medical devices in an identical manner and gives an example of surgical gloves as something regulated differently than surgical gowns. [Phillips Decl ¶¶17-24]. I do not believe that all medical devices are regulated in an identical manner. Rather, medical devices are subject to a common set of general regulations and statutes, including 21 U.S.C. §§ 331, 351, 352, and 334. Other statutes and regulations build on this base. That some devices have additional special regulations does not contradict this and is not surprising. Different products are by necessity evaluated differently. This is a rather unremarkable observation. However, just because the FDA has not promulgated special regulations for a particular type of device does not mean that the device does not have to follow the laws, regulations, and rules that apply generally *to all devices*. The general background statutes and regulations, such as 21 U.S.C. §§ 331, 351, 352, and 334 still apply. In that sense, "one size does fit all." In other words, a product is not exempt from complying with these and other statutes and regulations based on a company or its expert's self-serving subjective determination that one product is less important than another one, or should be subject to less stringent review and scrutiny. Just like surgical gloves, gowns are regulated by the FDA. They are no less important than gloves. Defective gowns, like defective gloves, merit regulatory enforcement actions, which is why the general statutes apply to them like they do to other devices.

I. **Regardless of the Other Enforcement Tools the FDA Has, the MicroCool Gowns Are Misbranded, Adulterated, and Subject to Condemnation.**

35. Mr. Phillips claims I "incorrectly suggest[ed] that the MicroCool Gowns would have been subject to seizure or condemnation based on the testing failures under the revised PB70:2012 standard." [Philips Decl. ¶ 62.] He then lists a number of enforcement options the FDA has, ranging from warning letters to recalls to taking no action at all. [Philips Decl. ¶¶ 64-65.] The fact that the FDA has many enforcement options available does not make any particular one unavailable. I never claimed that the FDA seizes every misbranded or adulterated device, only that such

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

devices are *subject to seizure or condemnation and cannot be legally sold.* Mr. Phillips confuses three things: violation, penalties, and enforcement. Here, the violation is placing the MicroCool Gowns into interstate commerce. Penalties include seizure or condemnation. The FDA always has the option to enforce violations, but to be able to do so, it must be aware of them. I understand Plaintiff claims Defendants concealed the misbranded nature of the MicroCool Gowns. If this is the case, naturally, the FDA would be unable to enforce the violation.

36. A simple analogy helps to illustrate the distinction. A man commits a burglary at a store. Because a burglary is a crime, there is a violation that is potentially punishable by being put in prison. Perhaps the store never realizes items are missing or police never find out the man was the one who committed the burglary. This naturally would prevent the prosecutor from enforcing the law. If the man is caught and arrested, the prosecutor has a number of enforcement options, including options short of seeking a jail sentence (such as a fine, community service, etc.). However, she may decline to prosecute for a number of reasons—perhaps because she does not believe there is enough evidence. If she chooses to prosecute, she may seek a jail sentence, or let the man go in exchange for parole or community service. But that does not take away from the fact that burglary is still a crime. Instead, Mr. Phillips seems to believe the law as it relates to misbranding or adulterating surgical gowns applies only "if you get caught." That is completely contrary to basic common sense. Based on my experience as a California Food and Drug Investigator and FDA Level II Field Investigator, California and the FDA do not share this philosophy.

37. Mr. Phillips also believes that the FDA's lack of enforcement makes it "sheer speculation to opine that the MicroCool gowns could not continue to be sold, purchased, and used." [Phillips Decl ¶ 66.] He forgets that if what Plaintiffs are alleging is true—i.e., that Defendants concealed the non-compliance from the public—then the lack of prosecution is not surprising at all, as it would explain how the FDA did not become aware of any problem. In any event, there is no speculation in my analysis.

**REBUTTAL DECLARATION OF DENNIS M. MOORE**

If the gowns are not AAMI-4 compliant, they are misbranded and adulterated. If they are misbranded or adulterated, they cannot legally be sold. Neither of these steps requires a determination from the FDA.

**J.  The Opinions I Offer Are Based on the Assumption that the MicroCool Gowns Did Not Meet the AAMI Level 4 Standard for Fluid Barrier Protection.**

38. Contrary to Defendants' attempt to imply otherwise [Evidentiary Objections at 18], my analysis is based on the assumption that the MicroCool Gowns did not meet the AAMI Level 4 standard for fluid barrier protection. It is not within the scope of my engagement to determine whether there is evidence to support that contention. However, I understand that Plaintiffs have submitted a significant amount of evidence before the Court that supports this allegation. This evidence includes but is certainly not limited to a document KC created in February 2013 wherein they admitted internally that **"Microcool Gowns (AAMI 4) are not meeting the AAMI Standard requirement for barrier performance as required in ASTM 1670 and the 510(k)."** I understand this document is attached to the Declaration of Michael J. Avenatti with Exhibits in Support of Plaintiffs' Motion for Class Certification as Exhibit 15.

**K.  I Do Not Offer an Economic Opinion or Claim to Be An Economist.**

39. Defendants inexplicably claim that I have offered an economic opinion. [Evidentiary Objection at 10.] I have not done so. I previously stated "As a result, there would be no lawful market for this adulterated and misbranded product." [Moore Decl. ¶ 27.] I did not attempt to provide an economic expert's opinion. Instead I stated a conclusion as a regulatory enforcement expert that there was no lawful market, because all transactions involving the gowns would violate the law. When I called the gowns "essentially worthless," I was not offering an economic opinion, but instead was using my knowledge and experience as a regulatory enforcement expert to conclude that the gowns could not lawfully be used for anything. And further, I was making the assumption that large companies like Kimberly-Clark and Halyard Health, and their

customers, choose to do business in the marketplace for legal goods, as opposed to any black or gray market. Thus, any market for the gowns that would exist in spite of them being misbranded and adulterated would therefore be an illegal market. In the event Defendants seek to establish that an illegal black market for the MicroCool Gowns exists, I am not qualified to discuss such a market and make no attempt to do so.

**L. My Opinion Does Not Depend on Whether the 2003 PB70 Standard or the 2012 PB70 Standard Applies.**

40. I have not offered, and do not offer, an opinion on whether the 2003 PB70 standard or the 2012 PB70 standard applies to the MicroCool Gowns at issue in this case. My analysis begins with the assumption that the standard the gowns are required to comply with was violated. It does not depend on whether the standard violated is 2003 PB70 or 2012 PB70, or whether the standard changed. Regardless of which standard or standards were violated, because the gowns violated a standard they were required to comply with by virtue of their 510k, the gowns are misbranded and adulterated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 8 day of August 2016.

_____
Dennis M. Moore

REBUTTAL DECLARATION OF DENNIS M. MOORE