EAGAN AVENATTI, LLP
Michael J. Avenatti, State Bar No. 206929
mavenatti@eaganavenatti.com
Ahmed Ibrahim, State Bar No. 238739
aibrahim@eaganavenatti.com
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Telephone:   949.706.7000
Facsimile:    949.706.7050

Attorneys for Plaintiff, Individually and On
Behalf of All Others Similarly Situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HRAYR  SHAHINIAN,  M.D.,  F.A.C.S., et al.,<br><br>                       Plaintiff,<br><br>            vs.<br><br>KIMBERLY-CLARK  CORPORATION, a Delaware Corporation, and HALYARD HEALTH, INC., a Delaware Corporation,<br><br>                       Defendants. | CASE NO.:  14-CV-08390 DMG (PLA)<br><br>**PLAINTIFF BAHAMAS SURGERY CENTER, LLC'S MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF DOMINIQUE HANSSENS (FED. EVID. 702; <u>DAUBERT V. MERRELL DOW PHARMACEUTICALS</u>) AND REQUEST FOR <u>DAUBERT</u> HEARING** |

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION .................................................................................................. 1

II.  LEGAL STANDARD ........................................................................................... 2

    A.  Dr. Hanssens' Opinions Based on Data From His Survey
        Are Unreliable Because They Do Not Meet the Standards of
        Objective Surveying and Statistical Techniques ............................................ 4

        1.  Dr. Hanssens' Opinions Based on His Survey Data
                Do Not Meet the Standards of Objective Survey
                Techniques Because He Asked Improper Open-Ended
                Questions .......................................................................... 4

        2.  Dr. Hanssens' Opinions Based on His Survey Data
                Do Not Meet the Standards of Objective Survey
                Techniques Because He Failed to Define Technical
                Terms Which, By Design, Confused the Survey
                Respondents .......................................................................... 7

    B.  Dr. Hanssens Improperly Defines Plaintiff's But-For
        Damages Scenario and Misconstrues Plaintiff's Non-
        Disclosure Claims .......................................................................... 9

III.  CONCLUSION .......................................................................... 14

1

## <u>TABLE OF AUTHORITIES</u>

2

3

## <u>CASES</u>

4

<u>Abbit v. ING USA Annuity,</u>
 2015 WL 7272220 (S.D. Cal. Nov. 16, 2015)..............................................................11

<u>Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.,</u>
 189 F.3d 1017 (9th Cir. 1999) ......................................................................................10

<u>Anti-Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.,</u>
 684 F.2d 1316 (9th Cir. 1982) ........................................................................................8

<u>Bourjaily v. United States,</u>
 483 U.S. 171 (1987)..........................................................................................................3

<u>Citizens Fin. Group, Inc. v. Citizens Nat'l Bank,</u>
 383 F.3d 110 (3d Cir. 2004) ...........................................................................................4

<u>Colgan v. Leatherman Tool Group, Inc.,</u>
 135 Cal. App. 4th 663 (2006) .......................................................................................10

<u>Cortez v. Purolator Air Filtration Prods. Co.,</u>
 23 Cal. 4th 163 (2000) ...................................................................................................10

<u>Daubert v. Merrell Dow Pharm., Inc.,</u>
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ...................................... Passim

<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.,</u>
 43 F.3d 1311 (9th Cir. 1995) .....................................................................................1, 3

<u>E. & J. Gallo Winery v. Gallo Cattle Co.,</u>
 967 F.2d 1280 (9th Cir.1992) ..........................................................................................5

<u>E. I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.,</u>
 393 F. Supp. 502 (E.D.N.Y. 1975) ................................................................................8

<u>Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,</u>
 618 F.3d 1025 (9th Cir. 2010) ........................................................................................4

Fragale v. Faulkner,
  110 Cal.App.4th 229 (2003) ........................................................................10

Guido v. L'Oreal, USA, Inc.,
  2013 WL 3353857 (C.D. Cal. July 1, 2013)..........................................10, 13

In re ConAgra Foods, Inc.,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ...............................................4, 6, 8

In re First Alliance Mortgage Co.,
  471 F.3d 977 (9th Cir. 2006) ...................................................................9, 10

In re Front Loading Washing Mach. Class Action Litig.,
  2013 WL 3466821 (D.N.J. July 10, 2013) .......................................................7

J & J Snack Foods, Corp. v. Earthgrains Co.,
  220 F. Supp. 2d 358 (D.N.J. 2002)...........................................................4, 7

Kumho Tire Co., Ltd. v. Carmichael,
  526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ............................1, 3

LG Elecs. U.S.A., Inc. v. Whirlpool Corp.,
  661 F. Supp. 2d 940 (N.D. Ill. 2009)........................................................5, 6

Pittsburgh Press Club v. United States,
  579 F.2d 751 (3d Cir. 1978) ....................................................................4, 7

Premier Nutrition, Inc. v. Organic Food Bar, Inc.,
  2008 WL 1913163 (C.D. Cal. Mar. 27, 2008).................................................8

Pulaski & Middleman, LLC v. Google, Inc.,
  802 F.3d 979 (9th Cir. 2015) ...............................................................10, 11

Spraying Systems Co. v. Delavan, Inc.,
  975 F.2d 387 (7th Cir. 1992) .........................................................................5

Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush & Co., Inc.,
  240 F.3d 832 (9th Cir. 2001) .........................................................................5

United States v. Cordoba,
  104 F.3d 225 (9th Cir. 1997) .........................................................................3

-ii-

**PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF DOMINIQUE HANSSENS**

## **RULES**

Fed. R. Evid. 702 ................................................................................................... Passim

## **OTHER AUTHORITIES**

CACI 1923 ...............................................................................................................10

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5053 .......2

*Handbook of Recommended Procedures for the Trial of Protracted,*
   25 F.R.D. 351 (1960) ...........................................................................................4

*Reference Manual On Scientific Evidence* 253 .................................................................5

Plaintiff Bahamas Surgery Center, LLC respectfully submits this memorandum of law in support of its motion to exclude, or in the alternative limit, the expert testimony of Dominique Hanssens under Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.

## I.     INTRODUCTION

Defendant Kimberly-Clark Corporation and Halyard Health, Inc.'s (collectively, "Defendants") expert, Dominique Hanssens, Ph.D, seeks to present expert testimony at the trial in this matter expressing the following opinions:  (1) that the MicroCool Gown purchasers Hanssen surveyed did not identify the AAMI Level 4 certification as an important factor in the purchase of disposable surgical gowns; (2) that most purchasers did not understand the AAMI Level 4 label and, therefore, it must not be important to them; (3) that Plaintiff's damages model is contradicted by certain facts and principles; and (4) that Plaintiff's expert had committed certain alleged errors.     [Omnibus Declaration of Michael J. Avenatti in Support of Plaintiff's Motions to Exclude or Limit Expert Testimony ("Avenatti Decl."), Ex. 10 Dr. Hanssens Expert Report ("Hanssens") at pp. 27-31, 32-37, 38-41.]

A trilogy of well-settled case precedent deals with the district court's role as gatekeeper with respect to expert testimony and establishes guidelines for the evaluation of such testimony. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert I)</u>, 509 U.S. 579, 592 (1993); <u>Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert II)</u>, 43 F.3d 1311, 1316 (9th Cir. 1995); and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Under these "<u>Daubert</u> standards," the court acts as a gatekeeper to keep out irrelevant or unreliable expert testimony. <u>See</u> <u>Kumho Tire</u>, 529 U.S. at 145; <u>Daubert</u>, 509 U.S. at 596.  Plaintiff's motion should be granted for at least the following reasons:

*First*, Dr. Hanssens' opinions based on data from his survey are unreliable.  To begin with, Dr. Hanssens opinions based on his survey data do not meet the standards of

objective survey techniques because he asked improperly open-ended questions.   In addition, Dr. Hanssens' survey data is unreliable because he failed to define technical terms which, by its design, confused survey respondents.   This resulted in skewed survey data that sharply conflicted not only with the survey conducted by Plaintiff's expert, but also with *Defendants' own internal surveys*.

*Second*, Dr. Hanssens improperly defines Plaintiff's 'But-For' damages scenario and misconstrues Plaintiff's concealment/non-disclosure claims, which renders his opinion neither relevant nor reliable in light of the issues in the case.

## II.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs "Testimony by Expert Witnesses."  The Rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Defendants bear the burden of proving the admissibility of their experts' testimony.[1] In determining whether the offering party has met its burden of establishing

---

[1] It is axiomatic that the burden of proof is on the party introducing evidence. <u>See</u> Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5053 ("Normally the proponent of the evidence will have the burden of proving the facts upon which admissibility depends, though often the objector will have the burden of producing evidence to show the existence of grounds for the objection."). In <u>Daubert</u>, the Supreme

Continued on the next page

-2-

the admissibility of expert evidence, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert I), 509 U.S. 579, 592 (1993). The Supreme Court construed Rule 702 to impose on federal courts the gatekeeping role of ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert I, 509 U.S. at 597. In performing its duty as "gatekeeper," the trial judge must determine whether or not the underlying proposed expert testimony is scientifically valid, amounts to "scientific knowledge," constitutes "good science," and is "derived by the scientific method." Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert II), 43 F.3d 1311, 1316 (9th Cir. 1995). In addition to meeting the Daubert standard, any proffered expert opinion must "assist the trier of fact in understanding the evidence or in determining a fact in issue." United States v. Cordoba, 104 F.3d 225, 229 (9th Cir. 1997).

The Supreme Court in Daubert I held that courts should consider five criteria when determining the admissibility of expert testimony: (1) whether the proffered knowledge can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has gained general acceptance in the relevant scientific community. See Daubert I, 509 U.S. at 592-94. A trial court should make findings on each of the relevant factors concerning whether expert testimony is scientifically reliable in order to properly exercise its discretion. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 159 (1999) (Scalia, J., concurring) ("[I]n a particular case[,] the failure to apply one or another of [the Daubert factors] may be unreasonable, and hence an abuse of discretion.")

---

Continued from the previous page

Court stated that the proponent of the evidence must show by a preponderance of the proof that the basis for the proffered expert opinion is reliable. See Daubert I, 509 U.S. at 592 n.10 (citing Bourjaily v. United States, 483 U.S. 171, 175-176 (1987)).

Accordingly, this Court should evaluate whether Dr. Hanssens' opinions offered in this case are based on a scientific and reliable methodology as a prerequisite to allowing the jury to consider the weight of competing expert testimony.

A.   **Dr. Hanssens' Opinions Based on Data From His Survey Are Unreliable Because They Do Not Meet the Standards of Objective Surveying and Statistical Techniques**

In performing its gatekeeping role, this Court must determine whether the expert's opinions assist the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  Because unreliable opinions are also unhelpful, this standard "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 592.

With respect to surveys, "[t]he Ninth Circuit has held that before a survey can be admitted it must:  (1) be 'conducted according to accepted principles'; and (2) be 'relevant' to the issues in the case." In re ConAgra Foods, Inc., 90 F. Supp. 3d 919, 950 (C.D. Cal. 2015) (citing Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., 618 F.3d 1025, 1036 (9th Cir. 2010)).  Specifically, "the data must be properly gathered and accurately reported.  It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques." Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir. 1978) (citing Judicial Conference Study Group, *Handbook of Recommended Procedures for the Trial of Protracted Litigation*, 25 F.R.D. 351, 429 (1960)).  "Only if the expert testimony and related survey are useful, reliable, and have probative value after all their deficiencies are taken into account is the evidence admissible." J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 370 (D.N.J. 2002).

1.   **Dr. Hanssens' Opinions Based on His Survey Data Do Not Meet the Standards of Objective Survey Techniques Because He Asked Improper Open-Ended Questions**

A party offering opinions based on survey evidence must show that the survey was conducted according to general principles and the opinion is reliable and relevant to the

issues.  In re ConAgra Foods, Inc., 90 F. Supp. 3d at 950; see also Citizens Fin. Group, Inc. v. Citizens Nat'l Bank, 383 F.3d 110, 121 (3d Cir. 2004) (excluding survey results because the "methodology was fundamentally flawed," and rejecting a contention that flawed methodology went to the weight, rather than the admissibility, of the survey); Spraying Systems Co. v. Delavan, Inc., 975 F.2d 387, 394 (7th Cir. 1992) (affirming exclusion of a survey because of its flawed questions).

Here, Dr. Hanssens, based in part on the results of his survey, concludes that "different buyers identify different factors as important in their purchase decisions;" that "no single factor dominates other factors in its importance to all buyers;" and that "the three mentions of AAMI level [among the survey respondents] indicate that very few purchasers require their gowns to meet this particular standard for protection."  [Hanssens at ¶62.]  However, Dr. Hanssens' reliance on the results of his survey to draw these conclusions ignores a major flaw in the survey, and both the flaw in the survey, and the analytical error in relying on the flawed data, render his opinion unreliable.  See Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 840 (9th Cir. 2001) (the court may consider a variety of factors, including survey design and nature of the questions), (citing E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292–93 (9th Cir.1992)).

The flaw in Dr. Hanssens' survey is that it presents an open-ended question—he asked the survey subjects to identify factors *they* considered important in a protective gown—as opposed to asking them about the importance of barrier protection.  [Avenatti Decl., Ex. 11 Rebuttal Report of Dr. David Stewart ("Stewart Rebuttal Report") at ¶10.] "Open-ended questions are more appropriate when the survey is attempting to gauge what comes first to a respondent's mind, but closed-ended questions are suitable for assessing choices between well-identified options or *obtaining ratings on a clear set of alternatives*."  LG Elecs. U.S.A., Inc. v. Whirlpool Corp., 661 F. Supp. 2d 940, 955 (N.D. Ill. 2009) (citing Shari Seidman Diamond, *Reference Guide on Survey Research, Reference Manual On Scientific Evidence* 253 (Federal Judicial Ctr. 2d ed. 2000))

(emphasis added).  In other words, Dr. Hannsens' survey was purposefully designed to get respondents to identify a range of factors they found important in a surgical gown in order to claim that only a small fraction of respondents believed that fluid barrier protection was important in a surgical.  A properly designed survey would have asked questions targeted to fluid protection to determine whether survey respondents found this to be an essential characteristic of a surgical gown.

The analogy to a survey conducted regarding automobiles presented by Dr. David Stewart, Plaintiff's marketing and survey expert, is instructive.  A survey that asks respondents without further guidance to identify the desirable attributes of an automobile may prompt them to volunteer their favorite color—but they may neglect to mention "tires."  [Stewart Rebuttal Report at ¶ 8.]  This is "because there is an expectation that all automobiles come with tires."  Id.  As Dr. Stewart further explains, "[a] fatal flaw in [Dr. Hanssens'] approach is that it is likely to elicit only factors that may differentiate products and is highly unlikely to elicit factors that that are expected to be present in all products in a category."  [Avenatti Decl., Ex. 12 Rebuttal Declaration of Dr. David Stewart In Further Support of Plaintiffs' Motion for Class Certification ("Stewart Rebuttal Decl".) at ¶10.]  In other words, by design, Dr. Hanssens' question diverts the survey respondents from thinking about shared traits among gowns, such as barrier protection certification—the very thing at issue in the case.  Id.  Accordingly, by definition, the survey fails a fundamental Daubert requirement: that the survey data have a "valid scientific connection to the pertinent inquiry as a precondition to admissibility."  Daubert I, at 592; see also ConAgra, 90 F. Supp. 3d at 950 (survey data must "be 'relevant' to the issues in the case").  Accordingly, the survey data should be excluded under Daubert.

Moreover, the flaw in the survey is further compounded by a flaw in the analysis.  Dr. Hanssens interprets the responses to an unsound question as a reflection of the lack of interest by the survey respondents in having a high AAMI rating in their gowns.  [Hanssens at ¶62.]  But as Dr. Stewart points out, this is a fallacy:  the car purchasers who

omit to identify tires among their high priority preferences are "very likely to state that tires are important (even critical) in their purchase decision and be unwilling to purchase an automobile without tires," if they were asked about it directly.   [Stewart Rebuttal Report at ¶10.]   See In re Front Loading Washing Mach. Class Action Litig., No. CIV.A. 08-51 FSH, 2013 WL 3466821, at *7 (D.N.J. July 10, 2013) ("Defendant is taking an inferential leap by arguing that this survey leads to an inference that the survey-takers never smelled any mold in their machines just because they indicated during the survey that they were happy with their machines, *without any specific query about smell, when that could easily have been asked*.") (emphasis added).

Accordingly, Dr. Hanssens' opinions regarding consumer preference for AAMI rated gowns based on the data obtained from his survey must be excluded.

> **2.    Dr. Hanssens' Opinions Based on His Survey Data Do Not Meet the Standards of Objective Survey Techniques Because He Failed to Define Technical Terms Which, By Design, Confused the Survey Respondents**

As noted above, the Daubert standard for surveys requires that "the data must be properly gathered and accurately reported." Pittsburgh Press Club, 579 F.2d at 758.  As such, "it remains essential to consider whether the population and *terms were properly defined*, whether the *design, questionnaires, and interviews met objective standards*, whether data was *accurately collected and reported*, whether data was *properly analyzed*, whether the *questions asked were unrelated to the material issues* of the case, whether questions were unfairly leading, and *whether questions were confusing*." J & J Snack Foods, 220 F. Supp. 2d at 369 (citing 4 *Weinstein's Federal Evidence* § 702.06[3]) (emphasis added).

Here, Dr. Hanssens asked his survey respondents:

> Please explain your understanding of what is required for a disposable surgical gown to meet the AAMI Level 4 standard?

and;

> Are you aware of a test for surgical gowns known as 'F1671-07 – Standard Test Method for Resistance of Materials Used in

Protective Clothing to Penetrate by Blood-Borne Pathogens
Using Phi-X174 Bacteriophage Penetration as a Test System?

Dr. Hanssens interpreted the bewildered responses from the respondents in his survey as supporting his conclusion that AAMI Level 4 designation is unimportant to them since they did not understand the concepts. [Hanssens Report at ¶¶67-68.]

The problem with the analysis and the data it is based on is that Dr. Hanssens' questions *themselves* confused the respondents. As Dr. Stewart points out, "[s]urvey respondents cannot give a meaningful response regarding the importance of a product attribute if they do not know the meaning of the attribute." [Stewart Rebuttal Report at ¶13.] This preference, as Dr. Stewart notes, is reflected in the case law regarding survey admissibility. [Id. at ¶12.] For example, in the landmark "*Teflon Survey*" case, the district court preferred the use of a survey with technical terms defined for respondents over three other surveys that did not define the terms. E. I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc., 393 F. Supp. 502, 526–27 (E.D.N.Y. 1975); see also Anti-Monopoly, Inc. v. Gen. Mills Fun Grp., Inc., 684 F.2d 1316, 1323–24 (9th Cir. 1982) (recognizing acceptance of *Teflon Survey*); Premier Nutrition, Inc. v. Organic Food Bar, Inc., No. SACV06-0827 AGRNBX, 2008 WL 1913163, at *9 (C.D. Cal. Mar. 27, 2008), aff'd, 327 F. App'x 723 (9th Cir. 2009) (same).

A survey must define any technical terms for its respondents so that they can provide competent responses. [Stewart Rebuttal Report at ¶12 ("A properly designed survey would have defined AAMI Level 4 in terms understood by the respondents").] Moreover, defining terms is the common, accepted practice in the scientific community. Id. at n.11. Accordingly, Dr. Hanssens' survey runs afoul of Daubert and should be excluded. See Daubert I, at 592-594 (court must consider whether the technique has gained general acceptance in the relevant scientific community); ConAgra, 90 F. Supp. 3d at 950 (survey must be "conducted according to accepted principles").

Here again, Dr. Hanssens' flawed survey is exacerbated by an analytical error: "he conflates respondent knowledge with the importance of the product benefit, fluid protection." [Stewart Rebuttal Report at ¶12.] First, the fact that survey respondents

cannot provide a technical description of the AAMI Level 4 standard does not mean they are oblivious to it: "Respondents may well be familiar with the standard and why it is important even if they are not aware of exactly how the test is done or what the test is comprised of." [Id. at 13.]  Second, the fact that respondents do not recognize the official agency name for a particular test does not mean that they disregard the importance of the matter tested: "A respondent's lack of awareness of such an incomprehensible, technical title indicates nothing about whether fluid protection is important in the purchase of a surgical gown." [Id.]  In fact, Kimberly Clark's own internal surveys showed that meeting industry standards and a high level of fluid protection are important to buyers. [Id. at ¶11.]  That Dr. Hanssens' survey results deviated so dramatically with both Dr. Stewart's survey and Kimberly-Clark's own surveys speaks volumes about the validity of the survey techniques employed by Dr. Hanssens for this litigation.  Accordingly, Dr. Hanssens' survey results, along with his proposed testimony regarding the survey results, must be excluded.

**B.     Dr. Hanssens Improperly Defines Plaintiff's But-For Damages Scenario and Misconstrues Plaintiff's Non-Disclosure Claims.**

The Court must determine whether the expert's opinions assist the trier of fact "to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; see also Daubert, 509 U.S. at 592. The accepted rule of a damages analysis is the "but-for" model, which substitutes a hypothetical proper course of action by defendant for its unlawful actions, and calculates economic damages tantamount to the difference between the hypothetical value plaintiff would have received from rightful conduct versus the real value of what the plaintiff actually received.  [Avenatti Decl., Ex. 6 Dr. Michael A. Williams Expert Report ("Williams") at ¶ 3.]

This is also consistent with the law regarding the measure of damages applicable to this case—namely, the out-of-pocket loss rule.  See In re First Alliance Mortgage Co., 471 F.3d 977, 1001 (9th Cir. 2006) ("The proper measure of damages in fraud actions under California law . . . is 'out-of-pocket' damages.").  "The out-of-pocket measure

restores a plaintiff to the financial position he enjoyed prior to the fraudulent transaction, awarding the difference in actual value between what the plaintiff gave and what he received." Id. (quoting Fragale v. Faulkner, 110 Cal.App.4th 229, 236 (2003)); see also CACI 1923 (instructing jury that to measure out-of-pocket loss, "you must determine the [fair market] value of what [name of plaintiff] gave and subtract from that amount the [fair market] value of what [he/she/it] received."). The same principles apply to calculating restitution awardable for violation of the UCL. See Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 988-89 (9th Cir. 2015) (for restitution under the UCL, "[w]here a defendant has wrongfully obtained a plaintiff's property, 'the measure of recovery for the benefit received . . . is the value of the property at the time of its improper acquisition . . . or a higher value if this is required to avoid injustice' where the property has changed in value.") (quoting Colgan v. Leatherman Tool Group, Inc., 135 Cal. App. 4th 663, 698-99 (2006)); see also Cortez v. Purolator Air Filtration Prods. Co., 23 Cal. 4th 163, 174 (2000) (Restitution is "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.").

"[O]ut-of-pocket damages are calculated *as of the time of the transaction*." Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv., 189 F.3d 1017, 1032 (9th Cir. 1999) (emphasis added); see also CACI 1923 ("Fair market value" component of calculation measured "on the date of the transaction . . ."). As recognized by this Court (and critical to the present analysis), "[o]ne method of quantifying the amount of restitution to be awarded is *computing the effect of unlawful conduct on the market price of a product* purchased by the class." [Dkt Entry 40 at 8 (quoting Guido v. L'Oreal, USA, Inc., No. CV 11-1067 CAS JCX, 2013 WL 3353857, at *14 (C.D. Cal. July 1, 2013) (emphasis added)).] Restitution can thus "be calculated by taking the difference between the market price actually paid by consumers and *the true market price that reflects the impact of the unlawful business practices*." Id. (emphasis added).

Here, in light of the proper methodology for conducting a but-for damages analysis and the above-recited rules for computing out-of-pocket loss and restitution, Dr.

Hanssens' opinions regarding how the but-for scenario should be defined must be excluded because they are neither relevant nor reliable. <u>Daubert I</u>, 509 U.S. at 597.

To begin with, Dr. Hanssens ignores Plaintiff's but-for scenario, where customers would have known before they made their purchases that MicroCool Gowns are not in compliance with the AAMI Level 4 standard, failed industry tests, and were unsafe. [Hanssens at ¶71.] Instead, Dr. Hanssens argues that Plaintiff "cannot reliably conclude that the subject gowns would not have any market value" because the lack of an AAMI 4 rating does not equate to the inability to use the gowns in particular surgical procedures,[2] because the gowns have alternate uses[3] and because, even without an AAMI 4 certification, the gowns are still purportedly highly effective.[4]   [<u>Id.</u> at ¶76-79.]   Dr. Hanssens' opinion directly conflicts with the Ninth Circuit's recent decision in <u>Pulaski</u>, where the Court concluded     the damage/restitution "calculation need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase."   <u>Pulaski</u>, 802 F.3d at 989 (emphasis added); <u>see also</u> <u>Abbit v. ING USA Annuity</u>, No. 13CV2310-GPC-WVG, 2015 WL 7272220, at *7 (S.D. Cal. Nov. 16, 2015) ("Recently, the Ninth Circuit held that damages calculations in UCL and FAL actions need not account for benefits received after purchase of the service because the focus is on the value of the service at the time of purchase.").

---

[2] This argument is rendered further incoherent because Dr. Hanssens accepts, arguendo, the premise of Plaintiff's case, which includes the finding in the Stewart survey that 93% of target purchasers would not be willing to purchase the gowns if it was disclosed that they did not meet AAMI Level 4.  [Hanssens Report at ¶74.]  Accordingly, this argument would not apply in at least 93% of the cases.

[3] This argument is similarly unsound because Plaintiffs have submitted evidence that the gowns would be worthless if Defendants had to disclose the known problems with the gowns at the time of purchase.  [<u>See</u> Williams, ¶6; Avenatti Decl., Ex. 7 Expert Report of Jeffrey O. Stull ("Stull") at Ex. 1, ¶65; Avenatti Decl. Ex. 8 Expert Report of Dr David Stewart ("Stewart"), ¶39; Avenatti Decl., Ex. 9 Expert Report of David M. Moore ("Moore"), ¶25.]

[4] This argument is belied by the unreported testing failures at the heart of this litigation.

In other words, whether purchasers arguably received benefits from actually using the gowns after they were purchased is irrelevant. The relevant question, instead, is what would happen to the market price of the gowns at the time of purchase if Defendants disclosed to purchasers that the gowns did not meet the AAMI Level 4 standard, failed industry standard tests relating to liquid barrier protection, and posed a safety risk? Neither Dr. Hanssens, nor any of Defendants' experts, offer an answer to this question. According to Plaintiff's experts, however, the gowns would have no value or a reduced value based on, among other things, (1) its personal protective equipment and AAMI and ASTM testing expert Jeffrey Stull's opinion that the MicroCool Gowns "could not be sold or used for [AAMI Level 1, 2, or 3] purposes" and "had no utility for any other purpose[,]" (2) Dr. Stewart's finding that the but-for-market price of mislabeled MicroCool gowns equals zero, and (3) Plaintiff's FDA enforcement and regulatory expert Dennis Moore's finding that mislabeled gowns cannot be sold or used. [See Williams, ¶6; Stull at Ex. 1, ¶65; Stewart, ¶39; Moore, ¶25.]

Moreover, Dr. Hanssens also critically ignores critical components of Plaintiff's concealment/non-disclosure theory of liability. Specifically, Dr. Hanssens ignores that Plaintiff's claims allege harm not only on the basis of Defendants' affirmative misrepresentation that the MicroCool Gowns were AAMI Level 4 gowns and the failure to disclose that the gowns were not AAMI Level 4 gowns, *but also* on the basis of Defendants' failure to disclose the ineffectiveness of the gowns based on facts known to Defendants that have nothing to do with the AAMI Level 4 standard. [Williams Report at ¶6.] Specifically, Plaintiffs also claim that Defendants failed to disclose that they knew the gowns failed industry standard tests relating to fluid barrier protection, posed a safety risk, and that there were complaints of strikethrough. Dr. Hanssens ignores these aspects of Plaintiff's concealment/non-disclosure claim that will be presented to the jury. This is another reason why his opinions should be excluded.

Finally, Dr. Hanssens opinions should also be excluded because he fails to account for the fact that in computing damages, the trier of fact will not be permitted to assume

that the true value of the MicroCool Gowns will be based on what the value would be if Defendants' wrongful conduct were disclosed to purchasers.  As noted above, "[o]ne method of quantifying the amount of restitution to be awarded is *computing the effect of unlawful conduct* on the market price of a product purchased by the class." [Dkt Entry 40 at 8 (quoting Guido v. L'Oreal, USA, Inc., No. CV 11-1067 CAS JCX, 2013 WL 3353857, at *14 (C.D. Cal. July 1, 2013) (emphasis added)).]  Restitution can thus "be calculated by taking the difference between the market price actually paid by consumers and *the true market price that reflects the impact of the unlawful business practices*." Id. (emphasis added).

In other words, the proper hypothetical but-for scenario is the difference between what purchasers actually paid for the MicroCool Gowns, and what the market value of the MicroCool Gowns would have been *at the time of purchase* had Defendants been required to disclose the unlawful business practice.  Accordingly, in the proper hypothetical but-for scenario, market value of the product taking into account Defendants' improper conduct means that prospective purchasers learn that the MicroCool Gowns are not AAMI Level 4, do not meet pass industry standard tests, and are unsafe *before* making their purchasing decision, completely in line with Plaintiff's model as supported by Dr. Stewart and Dr. Williams.  The partial refund model also follows the same before-purchase knowledge assumption.  Indeed, Dr. Hanssens implicitly recognizes the devastating impact to the market price of the gowns if Defendants would be required to disclose their unlawful practices, conceding that buyers' purchasing decisions "will incorporate not only the effect of the AAMI Level 4 designation, but also the negative sentiment generated by the manufacturer's disclosure, including potential loss of reputation, trust, and credibility." [Hanssens Report at ¶75.] In sum, because Dr. Hanssens fails to account for the fact that Defendants' disclosure of the true facts concerning the MicroCool Gowns are at the center of the damages/restitution calculation, his opinions must be excluded.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III.    CONCLUSION**

For the above-stated reasons, Plaintiff Bahamas Surgery Center, LLC respectfully requests that this motion to exclude, or in the alternative limit, the expert testimony of Dr. Dominique Hanssens be granted.  Plaintiff also requests a <u>Daubert</u> hearing to the extent the Court deems such a hearing to be necessary or helpful in assessing Plaintiff's motion.

Dated:  February 7, 2017                    EAGAN AVENATTI, LLP


By:  _____/s/ Michael J. Avenatti_____
          Michael J. Avenatti
          Attorneys for Plaintiff, Individually and
          On Behalf of All Others Similarly Situated