1   EAGAN AVENATTI, LLP
    Michael J. Avenatti, State Bar No. 206929
2   mavenatti@eaganavenatti.com
    Ahmed Ibrahim, State Bar No. 238739
3   aibrahim@eaganavenatti.com
    520 Newport Center Drive, Suite 1400
4   Newport Beach, CA 92660
    Telephone:  949.706.7000
5   Facsimile:   949.706.7050

6   Attorneys for Plaintiff, Individually and On
    Behalf of All Others Similarly Situated
7

8

9                    UNITED STATES DISTRICT COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11

12  HRAYR  SHAHINIAN,  M.D.,  F.A.C.S.,      CASE NO.:  14-CV-08390 DMG (PLA)
    et al.,
13                                            **PLAINTIFF BAHAMAS SURGERY**
             Plaintiff,                       **CENTER, LLC'S MOTION TO**
14      vs.                                   **EXCLUDE OR LIMIT EXPERT**
                                              **TESTIMONY OF DR. LAURENCE**
15  KIMBERLY-CLARK  CORPORATION,             **BAKER (FED. EVID. 702;**
    a Delaware Corporation, and HALYARD       **DAUBERT V. MERRELL DOW**
16  HEALTH, INC., a Delaware                  **PHARMACEUTICALS) AND**
    Corporation,                              **REQUEST FOR DAUBERT**
17                                            **HEARING**
             Defendants.
18

19

20

21

22

23

24

25

26

27

28

1
2

# **TABLE OF CONTENTS**

3
4

I.     INTRODUCTION ................................................................................ 1

II.    LEGAL STANDARD ........................................................................ 3

III.   ARGUMENT ..................................................................................... 6

A.  Dr. Baker Misunderstands How But-For Worlds Are Created for Damages Studies and Ignores the Out of Pocket Loss Rule. ................................ 6

B.  Dr. Baker Should Not Be Permitted to Perform a Comparison of Sales of MicroCool Gowns Before and After They Received Their AAMI Level 4 Designation. ................................................................................. 12

C.  Dr. Baker Should Not Be Permitted to Perform a Comparison of Sales of MicroCool Gowns Before and After This Lawsuit Was Filed. ...................... 144

D.  Dr. Baker Should Be Precluded From Testifying About the Contents of Contracts Defendants Incorrectly Believe Have Relevance to this Case. .................... 144

E.  Dr. Baker's Opinions That Plaintiff Improperly Ignored Distributor Markups, Discounts, and Incentive Programs Should Be Excluded. ................................ 155

F.  Dr. Baker Should be Precluded from Testifying that the MicroCool Gowns are not Effectively Useless. ................................................................ 177

IV.   CONCLUSION ............................................................................... 188

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## CASES

Alliance Mortgage Co. v. Rothwell,
 10 Cal.4th 1226 (1995) ...................................................................................7, 8

Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.,
 189 F.3d 1017 (9th Cir. 1999) ......................................................................8, 12

Bagdasarian v. Gragnon,
 31 Cal.2d 744 (1948) .................................................................................8, 9, 12

Bourjaily v. United States,
 483 U.S. 171 (1987)...........................................................................................4

Buist v. C. Dudley De Velbiss Corp.,
 182 Cal.App.2d 325 (1960) ...............................................................................9

Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,
 618 F.3d 1066 (9th Cir. 2010) .........................................................................15

Colgan v. Leatherman Tool Group, Inc.,
 135 Cal. App. 4th 663 (2006) ............................................................................8

Cortez v. Purolator Air Filtration Prods. Co.,
 23 Cal. 4th 163 (2000) .......................................................................................8

Daniel v. Ford Motor Co.,
 2016 WL 2899026 (E.D. Cal. May 18, 2016) ...................................................9

Daubert v. Merrell Dow Pharm., Inc.,
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ...................... Passim

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 43 F.3d 1311 (9th Cir. 1995) .....................................................................1, 4, 5

Fragale v. Faulkner,
 110 Cal. App. 4th 229 (2003) ......................................................................9, 12

Guido v. L'Oreal, USA, Inc.,
  2013 WL 3353857 (C.D. Cal. July 1, 2013)....................................................2, 9, 10, 11

In re First Alliance Mortgage Co.,
  471 F.3d 977 (9th Cir. 2006) ........................................................................................7

In re REMEC Inc. Sec. Litig.,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ...................................................................5, 14

Kumho Tire Co., Ltd. v. Carmichael,
  526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) .......................................1, 2, 5

Lloyd v. Conseco Fin. Corp.,
  2001 WL 36097624 (C.D. Cal. Oct. 19, 2001) .............................................................5

M2 Software, Inc. v. Madacy Entm't,
  2003 WL 25667611 (C.D. Cal. Jan. 3, 2003).............................................................6, 7

Nece v. Bennett,
  212 Cal. App. 2d 494 (1963) ........................................................................................8

OCM Principal Opportunities Fund v. CIBC World Markets Corp.,
  157 Cal. App. 4th 835 (2007) ...................................................................................8, 9

Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging,
  69 Cal.2d 33 (1968) ...................................................................................................15

People Who Care v. Rockford Board of Education,
  111 F.3d 528 (7th Cir.1997) .........................................................................................5

Pulaski & Middleman, LLC v. Google, Inc.,
  802 F.3d 979 (9th Cir. 2015) ................................................................3, 8, 9, 12, 17

Saunders v. Taylor,
  42 Cal.App.4th 1538 (1996) ...........................................................................9, 10, 12

Stout v. Turney,
  22 Cal. 3d 718 (1978) ..................................................................................................8

United States v. 12.94 Acres of Land in the Cty. of Solano,
  2009 WL 4828749 (E.D. Cal. Dec. 9, 2009) ................................................................5

**PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF DR. LAURENCE BAKER**

United States v. Artero,
  121 F.3d 1256 (9th Cir. 1997) ........................................................................5

United States v. Cordoba,
  104 F.3d 225 (9th Cir. 1997) ........................................................................4

Wady v. Provident Life & Accident Ins. Co. of Am.,
  216 F. Supp. 2d 1060 (C.D. Cal. 2002) ......................................................15

## STATUTES

Cal. Civ. Code § 3343(a) .................................................................................8

## RULES

Fed. R. Evid. 403............................................................................................14

Fed. R. Evid. 702...................................................................................1, 3, 4, 5

Fed. R. Evid. 1002..........................................................................................14

## OTHER AUTHORITIES

CACI 1923 ...................................................................................................8, 12

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5053 .......4

Plaintiff Bahamas Surgery Center, LLC respectfully submits this memorandum of law in support of its motion to exclude, or in the alternative limit, the expert testimony of Laurence Baker under Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.

## I.     INTRODUCTION

Defendant Kimberly-Clark Corporation and Halyard Health, Inc.'s (collectively, "Defendants") damages expert, Dr. Laurence Baker, seeks to present an expert report in which he asserts that:  (1) Plaintiff's damages expert Dr. Michael A. Williams used the incorrect "but-for scenario" in calculating damages; (2) the proper gown to use in a comparison for the partial refund model is the KC400 or Medline Prevention gown; (3) the Plaintiff's damage calculations do not reflect discounts offered by distributors; and (4) the MicroCool Gowns purchased by class members are not effectively useless. [Omnibus Declaration of Michael J. Avenatti in Support of Plaintiff's Motions to Exclude or Limit Expert Testimony ("Avenatti Decl."), Ex. 2 Expert Report of Laurence Baker, PH.D. ("Baker").][1]

A trilogy of well-settled case precedent deals with the district court's role as gatekeeper with respect to expert testimony and establishing guidelines for the evaluation of such testimony. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert I)</u>, 509 U.S. 579, 592 (1993); <u>Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert II)</u>, 43 F.3d 1311, 1316 (9th Cir. 1995); and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

---

[1] Dr. Baker also objects to in his rebuttal to the inclusion of governmental entities and distributors in calculating damages.  [Avenatti Decl., Ex. 3 Rebuttal Expert Report of Laurence Baker, PH.D. ("Baker Rebuttal Report")  ¶¶53-55, 59-64.]  Dr. Williams prepared his report before the class was certified, and has revised his calculations in light of the Court's clarification of the class definition.  Avenatti Decl., Ex. 4 Rebuttal Expert Report of Dr. Michael A. Williams. ("Williams Rebuttal Report") ¶2.]

-1-

Under these "Daubert standards," the court acts as a gatekeeper to keep out irrelevant or unreliable expert testimony.  See Kumho Tire, 526 U.S. at 145; Daubert, 509 U.S. at 596.  Plaintiff's motion should be granted for at least the following reasons:

1.     Dr. Baker's damages study ignores fundamental principles for how damages studies are constructed, and also ignores California law with regards to how damages under the out-of-pocket loss rule are measured.

2.     Dr. Baker cannot compare sales data of the KC400 gown to the MicroCool Gowns that class members purchased because the gowns were sold at different times. Moreover, Defendants are not alleged to have concealed material information concerning the effectiveness of the "MicroCool KC400" or Medline Prevention gown in the same way Defendants are alleged to have concealed material information regarding the MicroCool Gowns.  Accordingly, the gowns are not a proper basis for comparison because, as this Court recognized, "[o]ne method of quantifying the amount of restitution to be awarded is *computing the effect of unlawful conduct* on the market price of a product purchased by the class."  [Dkt Entry 40 at 8 (quoting Guido v. L'Oreal, USA, Inc., No. CV 11-1067 CAS JCX, 2013 WL 3353857, at *14 (C.D. Cal. July 1, 2013) (emphasis added)).]  Restitution can thus "be calculated by taking the difference between the market price actually paid by consumers *and the true market price that reflects the impact of the unlawful business practices*."  Id. (emphasis added).

3.     Dr. Baker should be precluded from comparing the sales of MicroCool gowns before and after this lawsuit was filed because buyers cannot be assumed to have heard and believed the allegations of the lawsuit, and moreover, Defendants have actively denied the allegations of the suit.

4.     Dr. Baker's testimony about the contents of contracts will not help jury members.  These contracts were deemed to be a "red herring" by this Court and, thus, are irrelevant to the trial.  Further, jurors should not be put in a position to interpret complex contracts—which, in any event, would be the province of the Court.  And even if the contracts were deemed to have minimal relevance to the case, Defendants would be

required to introduce the contracts into evidence for jurors to review for themselves.  Dr. Baker's summary of the contents of contracts violates the Best Evidence Rule.

5.     Dr. Baker's argument that Plaintiff's use of Defendant's wholesale prices for the MicroCool Gowns to calculate damages ignores distributor discounts is logically impossible because the distributors would be selling at a loss if they sold to end-users for less than wholesale rates.

6.     Dr. Baker should be precluded from opining that the full refund model is inapplicable because the MicroCool Gowns are not effectively useless.  This opinion ignores Ninth Circuit authority instructing that a calculation for damages/restitution "need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase." Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 988-89 (9th Cir. 2015).  Instead, the focus of the calculation "is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." Id.

## II.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs "Testimony by Expert Witnesses."  The Rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Defendants bear the burden of proving the admissibility of their experts' testimony.[2] In determining whether the offering party has met its burden of establishing the admissibility of expert evidence, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert I), 509 U.S. 579, 592 (1993). The Supreme Court construed Rule 702 to impose on federal courts the gatekeeping role of ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert I, 509 U.S. at 597.  In performing its duty as "gatekeeper," the trial judge must determine whether or not the underlying proposed expert testimony is scientifically valid, amounts to "scientific knowledge," constitutes "good science," and is "derived by the scientific method." Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert II), 43 F.3d 1311, 1316 (9th Cir. 1995). In addition to meeting the Daubert standard, any proffered expert opinion must "assist the trier of fact in understanding the evidence or in determining a fact in issue." United States v. Cordoba, 104 F.3d 225, 229 (9th Cir. 1997).

The Supreme Court in Daubert I held that courts should consider five criteria when determining the admissibility of expert testimony:  (1) whether the proffered knowledge can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has gained general acceptance in the relevant scientific community.

---

[2] It is axiomatic that the burden of proof is on the party introducing evidence. See Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5053 ("Normally the proponent of the evidence will have the burden of proving the facts upon which admissibility depends, though often the objector will have the burden of producing evidence to show the existence of grounds for the objection."). In Daubert, the Supreme Court stated that the proponent of the evidence must show by a preponderance of the proof that the basis for the proffered expert opinion is reliable. See Daubert I, 509 U.S. at 592 n.10 (citing Bourjaily v. United States, 483 U.S. 171, 175-176 (1987)).

See Daubert I, 509 U.S. at 592-94.  A trial court should make findings on each of the relevant factors concerning whether expert testimony is scientifically reliable in order to properly exercise its discretion.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 159 (1999) (Scalia, J., concurring) ("[I]n a particular case[,] the failure to apply one or another of [the Daubert factors] may be unreasonable, and hence an abuse of discretion.")

Courts in the Ninth Circuit will exclude expert testimony that ignores major factors in its analysis.  "[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court." United States v. Artero, 121 F.3d 1256, 1262 (9th Cir. 1997) (quoting People Who Care v. Rockford Board of Education, 111 F.3d 528, 537-38 (7th Cir.1997)); Lloyd v. Conseco Fin. Corp., No. CV00-10452MMM(RNBX), 2001 WL 36097624, at *6 (C.D. Cal. Oct. 19, 2001) (quoting Artero and excluding expert's testimony when his analysis failed "to account adequately for potentially explanatory variables").  Similarly, if an expert's analysis is based on making comparisons to other data, the data must in fact be comparable.  United States v. 12.94 Acres of Land in the Cty. of Solano, No. CIV S-07-2172 FCDEFB, 2009 WL 4828749, at *6 (E.D. Cal. Dec. 9, 2009) (excluding land appraiser when he did not use comparable properties in his analysis).  A "study may become so incomplete that it is inadmissible as irrelevant and unreliable.  Because the burden of proving helpfulness and relevance rests on the proponent of a regression analysis, it is the proponent who must establish that other major factors have been accounted for." In re REMEC Inc. Sec. Litig., 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010).

The standard grounds to exclude evidence, including relevance and prejudice, play a role in a Daubert analysis as well.  An expert's testimony is only admissible if "it logically advances a material aspect of the proposing party's case." Daubert II, 43 F.3d at 1315.  The Supreme Court has stated that under Rule 702, expert testimony must be "relevant to the task at hand." Daubert I, 509 U.S. 580.  "Expert testimony which does

not relate to any issue in the case is not relevant and, ergo, non-helpful." Id. at 591 (quotation and citation omitted).

Rule 403 becomes especially significant when considering the admissibility of expert testimony because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." Id. at 595 (citations and quotations omitted).

Finally, expert testimony is inadmissible when it merely states a conclusory opinion. See M2 Software, Inc. v. Madacy Entm't, No. CV 00-2853 AHM RZX, 2003 WL 25667611, at *2 (C.D. Cal. Jan. 3, 2003) (explaining that court considers "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability").

Accordingly, this Court should evaluate whether the opinions Dr. Baker offered in this case are based on a scientific and reliable methodology as a prerequisite to allowing the jury to consider the weight of competing expert testimony.

## III.   ARGUMENT

### A.   Dr. Baker Misunderstands How But-For Worlds Are Created for Damages Studies and Ignores the Out of Pocket Loss Rule.

Dr. Baker rejects Plaintiff's but-for scenario, where customers would have known before they made their purchases that MicroCool gowns are not in compliance with the AAMI Level 4 standard, failed industry tests, and were unsafe.   [Baker, ¶¶22-23.] Apparently unaware of the irony of what he is arguing, he states that the scenario is unrealistic because a "reasonable manufacturer would not label the gowns as meeting the AAMI Level 4 standard and at the same time make Plaintiff's proposed disclosure that the gowns do not comply with the standard." [Baker, ¶24.] *This, of course, is precisely why a full refund model is appropriate: nobody would buy the MicroCool Gowns labeled*

*as meeting the AAMI Level 4 standard if it were disclosed to purchasers that the gowns did not, in fact, meet that standard.* Instead, Dr. Baker believes the appropriate model is one where "Defendants would have disclosed the gowns' non-compliance with AAMI Level 4 standards . . . and would have taken the logical action of not labeling the gowns as if they were AAMI Level 4 compliant." [Baker, ¶25.]

A bedrock rule of a damages study is that the but-for world will describe the defendant's proper actions in place of its unlawful actions, with economic damages being the differences between the plaintiff's hypothetical value and the actual value of what the plaintiff achieved. [Williams Rebuttal Report, ¶3.] The but-for world will differ only in what actually happened with respect to the harmful act. [Id.] This is explained by Allen, Hall, and Lazear in the Federal Judicial Center's Reference Manual on Scientific Evidence, which Dr. Williams quotes and relies upon to explain the rules of damage studies. [Id.] Dr. Baker claims to have reviewed the work, [Baker, Appendix B, p. 2], but apparently does not comprehend it. He does not cite any economic authorities supporting his damage study arguments, presumably because he is not using a valid methodology and none exist.[3]

Principles applicable to conducting a damage analysis mirror the out-of-pocket loss measure of damages for fraud. When a party is fraudulently induced to enter into a transaction relating to the "purchase, sale, or exchange of property," the defrauded party has the option of rescinding the transaction or seeking their "out of pocket" loss as damages under Civil Code section 3343. Alliance Mortgage Co. v. Rothwell, 10 Cal.4th

---

[3] In fact, Plaintiff questions Dr. Baker's ability to conduct a simple damage analysis given his apparent and complete lack of understanding of how such an analysis should be conducted. It is unclear whether Dr. Baker—who may very well have an impressive resume as it relates to healthcare economics—has *ever* performed a damages study at any point in his life. His CV does not appear to reflect any experience in area. [Baker, Appendix A.] Plaintiff, therefore, reserves its right to challenge Dr. Baker's right to testify based on a lack of qualifications to testify regarding damages. This can be explored through examination of Dr. Baker at a Daubert hearing should the Court grant Plaintiff's request for such a hearing.

1226, 1240 (1995); see also In re First Alliance Mortgage Co., 471 F.3d 977, 1001 (9th Cir. 2006) ("The proper measure of damages in fraud actions under California law . . . is 'out-of-pocket' damages."). "The 'out-of-pocket' measure of damages is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction[.]" Alliance Mortgage Co., 10 Cal.4th at 1240. The "out-of-pocket" loss is thus measured as the difference between what the party paid, and the value of what they received at the time of the sale if the fraudulent information had been disclosed. See OCM Principal Opportunities Fund v. CIBC World Markets Corp., 157 Cal. App. 4th 835, 870, 876 (2007) (citing Stout v. Turney, 22 Cal. 3d 718, 725 (1978)); CACI 1923; Cal. Civ. Code § 3343(a). The same principles apply to calculating restitution awardable for violation of the UCL. See Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 988-89 (9th Cir. 2015) (for restitution under the UCL, "[w]here a defendant has wrongfully obtained a plaintiff's property, 'the measure of recovery for the benefit received . . . is the value of the property at the time of its improper acquisition . . . or a higher value if this is required to avoid injustice' where the property has changed in value.") (quoting Colgan v. Leatherman Tool Group, Inc., 135 Cal. App. 4th 663, 698-99 (2006)); see also Cortez v. Purolator Air Filtration Prods. Co., 23 Cal. 4th 163, 174 (2000) (Restitution is "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.").

The "value" is the "reasonable market value," which "is normally determined by the price at which it could be resold in an open market or by private sale if its quality or other characteristics which affect its value were known." Bagdasarian v. Gragnon, 31 Cal.2d 744, 753 (1948); see also Colgan v. Leatherman Tool Group, Inc., 135 Cal. App. 4th 663, 675 (2006) ("The term 'actual value' as used in Civil Code section 3343 means market value."); Nece v. Bennett, 212 Cal. App. 2d 494, 497 (1963) (Bagdasarian established that the term "actual value" as used in Civil Code section 3343 refers to "market value").

"[O]ut-of-pocket damages are calculated as of the time of the transaction." Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv., 189 F.3d 1017, 1032 (9th Cir. 1999). Critical to the present analysis, out-of-pocket losses can be proven through evidence of "what the market value of the [property] would have been *had the true facts been known*" regarding the undisclosed conditions.  Saunders v. Taylor, 42 Cal.App.4th 1538, 1543 (1996); see also Fragale v. Faulkner, 110 Cal. App. 4th 229, 240 (2003) (same); Bagdasarian, 31 Cal.2d at 753 (market value is price of property in open market "if its quality or other characteristics which affect its value were known."); Pulaski, 802 F.3d at 983 (construing the plaintiff's methods of calculating restitution as being "based on a 'but for' or 'out-of-pocket loss' calculation:  the difference between what advertisers actually paid and what they would have paid had Google informed them that their ads were being placed on parked domains and error pages.").

Similarly, as recognized by this Court, "[o]ne method of quantifying the amount of restitution to be awarded is *computing the effect of unlawful conduct on the market price of a product* purchased by the class."  [Dkt Entry 40 at 8 (quoting Guido v. L'Oreal, USA, Inc., No. CV 11-1067 CAS JCX, 2013 WL 3353857, at *14 (C.D. Cal. July 1, 2013) (emphasis added)).]  Restitution can thus "be calculated by taking the difference between the market price actually paid by consumers and *the true market price that reflects the impact of the unlawful business practices*."  Id. (emphasis added); see also Pulaski, 802 F.3d at 989 (restitution for a UCL claim based on a "fraudulent omission" is "based on what a purchaser would have paid at the time of purchase had the purchaser received all the information."); Daniel v. Ford Motor Co., No. 2:11-02890 WBS EFB, 2016 WL 2899026, at *7 (E.D. Cal. May 18, 2016) (same).

Thus, under California law, if the items purchased would not have had any market value had the material information been disclosed, then the amount of the out-of-pocket loss can be the equivalent of the full amount paid.  See OCM, 157 Cal.App.4th at 875-76 (allowing damages for full amount paid, because if the true information had been disclosed, the market value would have been worthless); Buist v. C. Dudley De Velbiss

Corp., 182 Cal.App.2d 325, 329, 334-35 (1960) (affirming award of damages in fraudulent non-disclosure case for full amount paid because market value of the property would have been nominal if the seller had disclosed the problems with the property at the time of sale).

Here, Dr. Baker ignores the Federal Judicial Center's Reference Manual on Scientific Evidence and his proposed expert testimony is inconsistent with the out-of-pocket loss rule. The opinions set forth in his expert report reflect a fundamental misunderstanding of the appropriate "but-for" scenario to ensure an accurate damage calculation. Dr. Baker urges the adoption of a so-called "realistic" but-for world in which the damages analysis assumes a model in which Defendants need not disclose their unlawful practices and instead sell surgical gowns that are not labeled as AAMI Level 4 compliant. However, this is simply not how damages analyses under the out-of-pocket loss rule work.

As noted above, out-of-pocket losses are proven through evidence of "what the market value of the [property] would have been *had the true facts been known*" regarding the undisclosed conditions. Saunders, 42 Cal.App.4th at 1543; see also Dkt No. 40 at 8 (restitution may "be calculated by taking the difference between the market price actually paid by consumers and *the true market price that reflects the impact of the unlawful business practices*.") (quoting Guido, 2013 WL 3353857, at *14 (emphasis added)). In other words, in order to conduct a proper analysis, Dr. Baker's model must take into account what would happen to the market price if at the time of purchase, the true condition of the MicroCool Gowns—i.e., that they are not AAMI Level 4, failed industry tests relating to fluid barrier protection, pose a safety risk, etc.—is disclosed to purchasers. Defendants cannot be permitted to employ a damages model which "softens the blow" of the fraud they committed by arguing that the true market value of the product sold was a completely different product free of defects or any problems.

As explained by Plaintiff's damage expert, the nature of the product being sold cannot be altered in a damages study, and yet, Dr. Baker proposes to do just that by

removing the AAMI Level 4 label.  [Williams Rebuttal Report, ¶9.]  As a result, Dr. Baker's model uses the hypothetical sale of a hypothetical product that buyers never considered or purchased.  [Id.]  Once again, this is not how a damage model works.

Another problem with Dr. Baker's analysis which warrants its exclusion is that he specifically ignores significant aspects of Plaintiff's concealment/non-disclosure claims.  Specifically, Dr. Baker ignores that Plaintiff's claims allege harm not only on the basis of Defendants' affirmative misrepresentation that the MicroCool Gowns did not meet the AAMI Level 4 standard, but also on the basis of Defendants' *failure to disclose* the ineffectiveness of the gowns based on facts known to Defendants that have nothing to do with the AAMI Level 4 standard.  [Williams Rebuttal Report, ¶6.]  For example, Dr. Baker's but-for world fails to account for the fact that Defendants would have to disclose to buyers before they purchased the MicroCool gowns that the gowns failed industry standard tests relating to liquid barrier protection.  [Id.]  Dr. Baker also critically omits from his analysis the fact that Defendants would have to disclose before purchase that the gowns posed a safety risk to doctors and nurses in high fluid procedures.  [Williams Rebuttal Report, ¶7.]

For this reason, Dr. Baker's use of the MicroCool KC400 [Baker ¶¶29-31] or Medline Prevention gowns [Baker ¶¶42-46] to calculate damages under the partial refund model is invalid.  As the Court has previously recognized, "[o]ne method of quantifying the amount of restitution to be awarded is *computing the effect of unlawful conduct* on the market price of a product purchased by the class."  [Dkt Entry 40 at 8 (quoting Guido, 2013 WL 3353857, at *14 (emphasis added)).]  Restitution can thus "be calculated by taking the difference between the market price actually paid by consumers *and the true market price that reflects the impact of the unlawful business practices*."  Id. (emphasis added).

Here, the KC400 and Medline Prevention Gowns do not account for damages attributable to Defendants' fraudulent concealment.  In other words, these are not valid benchmark gowns to use as a comparison to the MicroCool Gowns Plaintiff actually paid

for because they do not represent "the [fair market] value of what [the plaintiff] received" under the "out-of-pocket" loss measure of damages.  CACI 1923.  Instead, fair market value of what Plaintiff received would be the MicroCool Gowns *assuming that all of the problems with the gowns were actually disclosed to buyers before their purchase.* See Ambassador Hotel, 189 F.3d at 1032 ("[O]ut-of-pocket damages are calculated as of the time of the transaction."); Saunders, 42 Cal.App.4th at 1543 (out-of-pocket losses could have been proven through evidence of "what the market value of the [property] would have been *had the true facts been known*" regarding the undisclosed conditions); Fragale, 110 Cal.App.4th at 240 (same); Bagdasarian, 31 Cal.2d at 753 (market value is price of property in open market "if its quality or other characteristics which affect its value were known."); Pulaski, 802 F.3d at 983 (construing the plaintiff's methods of calculating restitution as being "based on a 'but for' or 'out-of-pocket loss' calculation:  the difference between what advertisers actually paid and what they would have paid had Google informed them that their ads were being placed on parked domains and error pages.").  [Williams ¶¶21-22.]  In this case, however, Defendants are not alleged to have concealed material information concerning the safety or effectiveness of the KC400 or the Medline Prevention gowns.  [Williams Rebuttal Report ¶¶15, 20-23.]  Accordingly, because Dr. Baker's damage model does not make any attempt to account for concealment-specific damages, he should specifically be prohibited from testifying about the use of the KC400 and Medline Prevention gowns to calculate damages.

**B.     Dr. Baker Should Not Be Permitted to Perform a Comparison of Sales of MicroCool Gowns Before and After They Received Their AAMI Level 4 Designation.**

Next, Dr. Baker improperly argues that "[i]f Plaintiff or the putative class members placed high values on the AAMI Level 4 designation, they would have increased their purchases of MicroCool gowns and they would have been willing to pay a higher price for the gowns after the designation was phased in."  [Baker, ¶33-34.]  Baker repeats this mistake later, when he inspects contracts that were renegotiated between June 2011 and

July 2012, when the MicroCool gowns gained their AAMI Level 4 designation.  [Baker, ¶47-57.]

In doing so, Dr. Baker ignores basic rules of economic analysis and makes no attempt to address the obvious flaw in his argument.  As Williams explains:

> It is a basic principle of damages analysis that the comparison of Plaintiffs' actual economic position with Plaintiffs' economic position if the harmful events had not occurred must be of *the same time period*.  In other words, there must be a price comparison of two products being sold at the same time to ensure an accurate calculation.  No one could credibly suggest that, for example, an iPhone 7 is the same caliber of smart phone as an iPhone 6 based on the mere fact that their sales price was the same during the differing periods of time in which they were being sold.  If sold during the same time period, obviously no one would be willing to pay the same or more for an iPhone 6 as an iPhone 7.  The same logic applies here.  No purchaser would be willing to pay the same price for a KC400 gown when Kimberly-Clark has released a supposedly superior version of that gown that has AAMI Level protection.

[Williams Rebuttal Report, ¶16.]  In essence, Dr. Baker ignores the obvious fact that improvements in products cause previous versions to become worth less than they were previously.  Without any attempt to address this issue, Dr. Baker's analysis ignores a major explanatory variable and therefore is divorced from any economic methodology and will not be helpful for the jury.  For this reason, it should be excluded.

Dr. Baker's contract renegotiation analysis is also useless because the renegotiations have not occurred in a world in which Defendants have disclosed all the alleged harmful events to each buyer *before* they made their purchase of a MicroCool Gown and/or before they entered into the contracts.  [Williams Rebuttal Report, ¶26.]  It also ignores that under the rules of damage calculation, "a buyer who pays more for a product than she would have paid if the product had been labeled accurately is, from an economic perspective, harmed at the moment of purchase."  [Williams Rebuttal Report, ¶25.]  This only provides more reason to exclude the testimony.

**C.    Dr. Baker Should Not Be Permitted to Perform a Comparison of Sales of MicroCool Gowns Before and After This Lawsuit Was Filed.**

Dr. Baker attempts to compare sales of the MicroCool Gowns before and after this lawsuit was filed and claim that because the sales of the gowns did not decrease after the lawsuit was filed, no harm occurred.  [Baker, ¶¶36-40.]  However, any such comparison should be precluded.  Defendants at all times, including immediately after the lawsuit was filed in October 2014 to the present day, continue to publicly deny that the gowns are defective. Purchasers, therefore, are not presumed to have accepted the allegations of the lawsuit as true (assuming they even read the pleadings in this case or media coverage about the case).  [Williams Rebuttal Report, ¶19.]  If Dr. Baker wished to make such an argument, he would need to establish first that a sufficient number of gown purchasers read the media coverage, believed the truth of the allegations, and then concluded that the gowns Defendants were selling at the time were *still defective* (because purchasers at the time could have just as easily believed that Defendants had resolved the problems with the gowns by the time the lawsuit was filed).  He does none of that, and is therefore missing major explanatory variables that would be necessary to advance this argument.  See In re REMEC Inc. Sec. Litig., 702 F. Supp. 2d at 1273 (striking expert from case because his study was "so incomplete that it is inadmissible as irrelevant and unreliable.").

**D.    Dr. Baker Should Be Precluded From Testifying About the Contents of Contracts Defendants Incorrectly Believe Have Relevance to this Case.**

Dr. Baker purports to analyze a number of contracts he contends govern the purchase of the gowns at issue in this case.  [Baker, ¶¶47-55.]  This Court, however, concluded "[t]hese contracts are a red herring."  [Dkt No. 270 at 19.]  The Court reached this conclusion after extensive briefing submitted by Defendants, along with oral argument at two separate hearings, attempting to convince the Court that these contracts have relevance to this case.  As the Court already decided, Defendants failed to meet their burden of demonstrating that any of these contracts—including even the "GK-164" contract Defendants claimed was applicable to Plaintiff Bahamas Surgery Center—

-14-

applied to this case.  [Dkt No. 270 at 18-21; Dkt No. 271 at 7-8.]  Defendants, therefore, should not be permitted to advance their contention that the contracts need to be analyzed by introducing them through Dr. Baker.

Further, jurors should not be put in a position to interpret complex contracts.  Even were the Court to find the contracts have marginal relevance to the case (which they do not), contract interpretation is the province of the Court, not the jury.  See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California, 618 F.3d 1066, 1073 (9th Cir. 2010) (citing Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging, 69 Cal.2d 33, 39–40 (1968)).  Calling upon jurors to assess Dr. Baker's testimony regarding the litany of contracts he seeks to interpret for the jury would thus be improper as a matter of law.

Finally, if for some reason the contracts were deemed to have minimal relevance to the case (again, they have no relevance), it would be a violation of the Best Evidence Rule for Dr. Baker to summarize the contents of these contracts for the jury.  Fed. R. Evid. 1002; Wady v. Provident Life & Accident Ins. Co. of Am., 216 F. Supp. 2d 1060, 1064 n. 12 (C.D. Cal. 2002).  To the contrary, every individual contract Dr. Baker contends has an impact on the damage calculation would need to be put into evidence and put in front of the jury to allow jurors to review those contracts for themselves.  This presentation would result in an undue consumption of time and potentially mislead the jury into giving the contracts, having been introduced by a credentialed expert, improper weight.  See Fed. R. Evid. 403.  Therefore, Dr. Baker should be excluded from testifying about the contents of GPO contracts, distributor agreements, and corporate agreements.

### E.   Dr. Baker's Opinions That Plaintiff Improperly Ignored Distributor Markups, Discounts, and Incentive Programs Should Be Excluded.

Dr. Baker argues that Dr. Williams has not "performed any analysis specific to this industry and the way prices are determined in support of his opinions."  [Baker, ¶50.] Specifically, he believes that Dr. Williams cannot use MicroCool sales data for damages calculations because "the price data exclude distributor mark-ups and also a variety of

lump-sum year-end discounts offered to buyers as part of incentive programs" that could make ultimate prices higher or lower. [Baker, ¶59.] Dr. Baker also believes that "it is not possible to ascertain a price premium attributable to a product that is just one of many products contained within a given CPT." [Baker, ¶60.]

In both cases, Dr. Baker is simply wrong. Basic economic theory requires distributors' profits to be nonnegative in order for them to keep selling the MicroCool Gown to end users. This implies that distributors would charge prices to end users no lower than the prices distributors paid to Defendants. [Williams Rebuttal Report, ¶31.] Despite Dr. Williams having previously noted that it has never been contended that Defendants offered discounts that were not reflected in the sales records Dr. Williams used in his analysis, Dr. Baker does not appear to dispute this fact. [Williams Rebuttal Report, ¶32.] Instead Dr. Baker repeats his unaccounted for *distributor* markup or discount argument. But the distributor discounts could never result in distributors selling at a loss; otherwise they would stop selling MicroCool gowns, because they would be losing money. [Id.] For example, if Defendants sold their gowns to distributors for $7, the distributors may generally sell their gowns for $9. It is possible that they issue discounts or end of year refunds that reduce the effective price of the gowns to $8. However, they would not issue discounts so large that the price of the gowns becomes $6 because then they would be losing money. This remains true for CPT manufacturers as well. [Williams Rebuttal Report, ¶34-35.] Indeed, the Court in its class certification order recognized that Dr. Williams' analysis represented a conservative estimate of damages. [Dkt. No. 270 at 29-30 ("Because the CPT manufacturers and other third-party vendors charged putative class members more than what they paid Defendants for the gowns, the sales data represents "conservative" damage estimates.").]

To be clear, Dr. Baker is not claiming that there are unaccounted for discounts offered by Defendants to distributors, but rather that discounts distributors offer their customers are not reflected in Defendants' sales to distributors. Any discount offered by a distributor would not result in the distributor selling the MicroCool gowns for less than

the distributor paid for them.  Because Dr. Baker ignores this logical problem, and the bedrock economic assumption that parties are rational actors, his arguments are completely unsupported.  His opinions relating to distributor markups, discounts, and incentive programs, therefore, should be excluded.

### F.   Dr. Baker Should be Precluded from Testifying that the MicroCool Gowns are not Effectively Useless.

Dr. Baker argues that a full refund model is unavailable because "it is reasonable to assume that these gowns were used for their intended purposes in medical procedures" and that therefore the class members received the benefit of the bargain.  [Baker, ¶61.] He also claims that many customers repurchased the MicroCool gowns and that the number of "complaints" was low.  [Baker, ¶63-64.]  Dr. Baker's proposed testimony on these topics should be excluded for several reasons.

First, Dr. Baker is not an expert on the MicroCool Gowns, surgical gowns in general, or personal protective equipment.  Therefore, he is simply not qualified to provide testimony about whether the gowns actually provided benefits to Plaintiff or class members.

Second, Dr. Baker should be precluded from opining that the full refund model is inapplicable because the MicroCool Gowns are not effectively useless.  This opinion is inconsistent with Ninth Circuit authority instructing that a calculation for damages/restitution "need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase."  Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 988-89 (9th Cir. 2015).  Instead, the focus of the calculation "is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." Id.  Therefore, Dr. Baker and Defendants' argument that the MicroCool Gowns had value by pointing to actual post-purchase use of the gowns is legally irrelevant.

Third, Dr. Baker's argument is also fatally flawed because the end users were not aware that the gowns were defective.  [Avenatti Decl., Ex. 5 Rebuttal Declaration of Dr.

Michael A. Williams in Further Support of Plaintiffs' Motion for Class Certification ("Williams Rebuttal Declaration"), ¶17.]  Dr. Baker makes no claim that users would be able to tell that their gowns were defective.  The purportedly low complaint rate is unhelpful as well.  Dr. Baker does not make any attempt to compare the purported rate of complaints of the MicroCool gowns to anything else, or even claim that he knows what the typical complaint rate for surgical gowns are.  Without these statistics, it is impossible to know whether the complaint rate is "low."

Finally, Dr. Baker's opinion ignores the opinions of Plaintiff's experts that, at the time of purchase, the gowns would have no value or a reduced value based on, among other things, (1) Plaintiff's personal protective equipment and AAMI and ASTM testing expert Jeffrey Stull's opinion that the MicroCool Gowns "could not be sold or used for [AAMI Level 1, 2, or 3] purposes" and "had no utility for any other purpose[,]" (2) Plaintiff's marketing and survey expert Dr. David Stewart's finding that the but-for-market price of mislabeled MicroCool gowns equals zero, and (3) Plaintiff's FDA enforcement and regulatory expert Dennis Moore's finding that mislabeled gowns cannot be sold or used.  [See Avenatti Decl., Ex. 6 Expert Report of Dr. Michael Williams ("Williams"), ¶6; Avenatti Decl., Ex. 7 Expert Report of Jeffrey O. Stull ("Stull") at Ex. 1, ¶65; Avenatti Decl., E. 8 Expert Report of Dr. David W. Stewart ("Stewart"), ¶39; Avenatti Decl., Ex. 9 Expert Report of David M. Moore ("Moore"), ¶25.]

## IV.   CONCLUSION

For the above-stated reasons, Plaintiff Bahamas Surgery Center, LLC respectfully requests that this motion to exclude, or in the alternative limit, the expert testimony of Dr. Laurence Baker be granted.  Plaintiff also requests a Daubert hearing to the extent the Court deems such a hearing to be necessary or helpful in assessing Plaintiff's motion.

Dated: February 7, 2017               EAGAN AVENATTI, LLP


                                      By:  _____/s/ Michael J. Avenatti_____
                                            Michael J. Avenatti

Attorneys for Plaintiff, Individually and
On Behalf of All Others Similarly Situated

**PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF DR. LAURENCE BAKER**